MICHAEL MOONEY

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa November 17, 1884.*

1. NEW TRIAL—*verdict against the evidence—in criminal case.* This court will reverse a judgment of conviction, in a case of felony, where the evidence on which it is based is all circumstantial and of an unsatisfactory character, and which, when all considered, leaves a serious and grave doubt of the guilt of the defendant.

2. While this court recognizes the rule that jurors are judges of the facts and the weight of evidence in all criminal cases, yet the law has imposed upon the court the solemn and responsible duty to see that no injustice has been done by hasty action, passion or prejudice, or from any other cause, on the part of the jury.

WRIT OF ERROR to the Circuit Court of Lake county; the Hon. CLARK W. UPTON, Judge, presiding.

Mr. R. M. WING, for the plaintiff in error.

Mr. C. W. BROWN, State's attorney, for the People.

Per CURIAM: The evidence contained in this record has been examined with the utmost care, and more so, perhaps, because of the fact that on two separate trials the accused was found guilty.   What evidence was given on the first trial

does not, of course, appear in the present record, as the verdict was set aside by the trial court. It must be borne in mind, the evidence which it is insisted establishes the all important fact in the case that the deceased came to his death by reason of wounds and injuries inflicted by defendant, is all circumstantial. It is not deemed necessary now to enter upon any analysis of what is insisted upon as the criminating evidence. It is sufficient to say it is not of a satisfactory character, and a majority of the court are of opinion it did not warrant the present conviction.

Recognizing to the fullest extent the rule of law that the jury, in their deliberations, are the judges of the facts and the weight of the evidence in all criminal cases, yet the law has imposed upon the court the solemn and responsible duty to see to it that no injustice is done by hasty action, passion or prejudice, or from any other cause, on the part of the jury. This duty the court may not omit in any case. In view of the character of the evidence, both as to the guilt of the accused and his mental condition at the time of the alleged killing, a majority of the court are of opinion the present judgment ought to be reversed, and the case submitted to another jury, that it may be fully and carefully tried by them, under the direction of the circuit court. To this end the circuit court should have granted a new trial and submitted the cause to another jury, and for the omission so to do, the judgment will be reversed and the cause remanded.

*Judgment reversed.*

Mr. JUSTICE WALKER, dissenting.

Mr. JUSTICE DICKEY: I concur in the opinion of the court, chiefly upon the ground that I think the decided weight of the evidence shows that the accused did not commit the homicide. I think, from the evidence, it was the suicide of an insane man.

Mr. Justice Mulkey, separate opinion:

Michael Mooney was indicted at the May term, 1883, of the circuit court of Will county, for the murder of John Anderson. Subsequently, on his application, the cause was removed, by change of venue, to Lake county. At the March term, 1884, of the Lake circuit court, he was tried and convicted upon said charge, the jury fixing his punishment at death. Motions for a new trial and in arrest of judgment being severally made and overruled, he was formally sentenced to be hung on the 23d day of May, 1884. In the meantime an application was made to this court for a writ of error, which was allowed, and a *supersedeas* ordered, and the judgment and sentence in the case are now before this court for review.

The homicide occurred in cell No. 310, in the State penitentiary at Joliet, on the 30th of May, 1883. The deceased and the accused were cell-mates, and the only occupants of the cell at the time, and both were convicts serving unexpired terms in the penitentiary. As the deceased and the accused were alone in the cell at the time of the occurrence, it may be assumed as reasonably certain that Anderson died either by his own hand or by the hand of the accused, as it is highly improbable the two acted in concert in committing the act. That Anderson died from wounds inflicted upon his person, is conclusively shown; but that the hand of the accused wielded the instrument that produced them, is not so clearly established. This was a material fact, which the State was bound to prove beyond a reasonable doubt, to warrant a conviction. The evidence relied on for this purpose was altogether circumstantial, the accused being the only living person who had an opportunity of knowing the truth of the matter, and he positively denies that he had any agency in inflicting the wounds in question.

Counsel for plaintiff in error maintains, first, that the evidence fails to satisfactorily establish the fact that the deceased died by the hand of the accused; and second, that conceding

this fact is sufficiently proved, then he insists that the weight of evidence shows that the accused, at the time of the homicide, was insane, and hence not criminally responsible for what he did. The evidence in the case is very voluminous, and is in the main directed to these two vital points, namely, the imputed agency of the accused in the homicide, and his alleged insanity.

It appears from the testimony of Merrill, one of the night guards of the prison, who was on watch at the time, that about half-past nine o'clock at night he heard, as he states it, "a terrific yell, as of some one in terrible agony," when he at once started for the place, the screaming, with a slight intermission, continuing all the time. He was but a moment in reaching the cell, when, looking in, he "saw Anderson down on his knees, bent over a stool, and holding on to the bars of the door with his left hand." As soon as the guard got there he threw the light of the lamp he was carrying, into the cell, and asked, "What is the matter?" Upon repeating the question, Mooney answered he had been asleep, and "guessed that fellow had a fit," to which the guard replied, "Why don't you get down and help him?" Mooney then started to get down from the upper bunk, when Anderson "let go his hold of the door, and tumbled over in the cell." The guard then left for a moment to notify McDougal, captain of the night guards, of what had happened. On his return with McDougal, he entered the cell and turned Anderson over, who gasped twice, and expired. The guard then took Mooney to another cell, having no conversation with him on the way, after which he said to Mooney, "What did he do it with?"—to which the latter replied, "With my tobacco knife,—a knife made here, which I had, to save my bread knife." There was blood on one of Mooney's hands, which the guard did not examine to see whether it was wet or dry; but it is evident from his testimony, it came from a wound on the prisoner's own hand, which he had received the day before. When the deceased

released his grasp on the bars of the cell door, and fell over, as just stated, Mooney was in the act of getting out of the bunk; but upon this happening, and the guard having gone to notify McDougal, he resumed his place in the upper bunk, and remained there for a minute or two after their return. There were found in the cell that night and the following morning, together, a tooth with blood on it, a common case knife lying a few inches under the edge of the lower bunk, near the middle, lengthwise, and a dirk knife,—the same referred to by Mooney in his conversation with Merrill. The floor of the cell and the body of the deceased were almost covered with blood, but none was discovered on the bed clothing of either bunk, except a small spot on the corner of a sheet at the foot of the lower berth, hanging near the floor. McDougal, in his testimony, makes the additional statement that when he opened the cell that night, Mooney made the remark, "I was asleep, by Jesus!" and thinks he was a little raised on his elbow at the time.

Hingston, one of the coroner's jury, testified that Mooney, at the request of the jury, was brought into the presence of the body of the deceased, at the time of the inquest, and was told to look at it, and make some explanation, if he could; that the accused replied he did not know anything about it, for he was asleep; that on defendant taking off his pants, what seemed to be a blood stain or stains, about three inches in length and an inch or inch and a half in width, was found on the left leg of his drawers, which the accused said he could not account for, unless Anderson might have touched him with his hands. This witness further said, on cross-examination: "Saw Mooney at his trial in Joliet, and observed him here, and the same inattention and indifference that he manifests here, I observed in him while before the coroner's jury."

The only evidence relied on as showing motive in Mooney to commit the crime, is the testimony of two or three con-

victs, who claim to have heard him, a short time before
Anderson's death, express dissatisfaction with his cell-mate.
To one of them, according to their statements, Mooney said
he "couldn't get along with that damned cell-mate of his."
To another he said Anderson was a crank,—to not be sur-
prised some morning to hear of him being carried out of the
cell. To another, that he could not get along with his cell-
mate; that he was growling all the time; that it would not
be a surprise to the boys in the wire shop if they heard of
Anderson being carried out on a stretcher, if they did not
take him out. The last two of these witnesses were in the
penitentiary for infamous crimes, (one for grand larceny, the
other for highway robbery,) which, coupled with the fact that
no complaint was ever made to any of the officers of the peni-
tentiary by Mooney, and that no one besides these convicts
appears to have known of any dissatisfaction on the part of
Mooney with respect to his cell-mate, undoubtedly entitles
their testimony to but little consideration. It is but a part
of the common experience of mankind, that persons situated
as these witnesses were, are ever ready to seize upon the
slightest opportunity to favorably attract public attention to
themselves, with the hope it may result in bettering their
own condition. Moreover, it is but reasonable to suppose,
assuming Mooney to have had sufficient understanding to
render him accountable for his acts, that had any serious
difficulty existed between him and Anderson, he would have
made complaint to some of the officers of the institution be-
fore resorting to such desperate means of relieving himself
from the annoyances of his situation.

Before adverting to the medical testimony, or the number
and character of wounds found on the body of the deceased,
it is important to have a clear understanding of the size,
form and inside arrangement of cell No. 310, which is a part
of the east wing of the building. This may be gathered from
the testimony of Miller, engineer of the penitentiary. He

says: "The cells are made of solid stone,—walls, floors and roofs,—the roof of one cell forming the floor of the one above it. The cells in the east wing are seven feet high, seven feet long, and four feet wide. There is a double iron bunk in each cell, two men occupying each cell. These bunks are one above the other, the upper bunk being eighteen inches above the lower one. These bunks are six feet two inches in length, and eighteen inches in width. The space between the bunk, which is placed close to one side of the cell, and the opposite side of the cell, is twenty-six inches. Each cell is furnished with two low, wooden stools, and a little wooden pail for water, and a slop pail."

Some bed clothing was placed under the head of Anderson that night, and his corpse remained in the cell until next morning, when his shirt and drawers were ripped open and removed from his body, upon which were found above thirty wounds, some two or three of which, only, were regarded as mortal. The number and description of the wounds given by Dr. Oakes are perhaps the most reliable. The examination made by him, assisted by Dr. Stiner, was conducted in the presence of the warden of the penitentiary, and others, including Mr. Hingston, a short-hand reporter, who noted, at the time, each wound, and its description, as publicly called out by Dr. Oakes. The description as taken down by the reporter was then read over, and pronounced correct by Dr. Oakes, and which, as abstracted, is as follows:

"A wound through lobe of right ear, penetrating the space between the mastoid process of temporal bone and the ramus of the lower jaw, passing into the cavity of the mouth, about one-half inch wide.—A wound, simply cutaneous, three inches below the right ear, inclining a little downward and forward, about one-half inch long.—The wounds in the acromial region are four in number, about one-half inch long, through skin and fascia, the direction of the wounds being from right to left oblique, at an angle of about 60°, the wound near cap of

shoulder being a very little longer, and apparently deeper.—
One wound just below middle of clavicle, oblique through skin
and fascia, five-twelfths to six-twelfths of an inch long.—One
wound in second intercostal space, about five-twelfths of an
inch long, through skin, fascia and muscle, entering pleural
cavity slightly oblique.—One wound over third rib, a little
outside of a perpendicular line drawn through right nipple,
extending to bone, about five-twelfths of an inch long, slightly
oblique. (The three wounds last described have the appear-
ance of being stabs, and the left angles of the wounds are
deeper than the right angles by one-twelfth of an inch or
more.)—One wound one and one-half inch below the nipple,
extending through the muscle, nearly transverse, about three-
fourths of an inch long.—One wound three-fourths of an inch
long, above the right nipple.—One wound three inches to the
left and a little below the right nipple. (These wounds, on
close inspection, look like stabs, the left angles being deeper
and wider than the right, and all of about the same dimen-
sions.)—One wound three inches to the right of left nipple
and to left of sternum, severing third costal cartilage, and
extending into third intercostal space, direction oblique, at
an angle of 30° or a little less, entering the heart.—A wound
to the right of the ensiform cartilage, three-fourths of an inch
long, apparently a stab, the angle of entrance being deeper
than the exit by one-twelfth of an inch or more, and termin-
ating in a cut through the skin from left to right, and down-
ward at an angle of about 45°, culminating in a second stab
of about the same dimensions and character of first wound.—
Two wounds in lumbar region, one over second false rib, the
other about three inches above the first, through skin and
fascia, about one-half inch long, and have the character of
stabs.—A stab over thenar eminence of thumb, through skin
and fascia, and partly through muscle.—One wound over the
fifth metacarpo-phalangeal joint.—One wound over the cen-
ter of the third phalange of index finger. (The latter three

wounds have the character of punctures or stabs.)—A wound between the third and fourth metacarpo-phalangeal joints, has the character of an incised puncture or stab. The four last named wounds are upon the left hand. *Left arm*—A wound two and one-half inches long, over the outer and upper aspect of elbow joint, extending through skin and fascia and into muscle, direction apparently from right to left, and obliquely downward. *Right arm*—Two wounds through skin only, near the elbow, on the outer side of arm. They have the appearance of cuts about three-fourths of an inch long.— One wound on the front and ulna side of the forearm, midway between the wrist and the elbow, about an inch long, extending through the skin and fascia and into muscle, and has the character of an incised wound. *Back of right arm*—A wound extending from the ulna to the radial side of the hand, on the posterior aspect of the wrist. This wound has the appearance of having been made by a knife cutting through the skin and fascia to muscle on ulna side, and then through the skin only, for a short distance, and a second effort causing the knife to pass deeper as it reached the radial side. *Back of left arm*—Two wounds on the dorsum of second metacarpo-phalangeal joint. They have the character of incised wounds about half an inch long, extending through skin.—A wound two inches long over back of left hand, the direction being nearly transverse, and extending through skin and partly through fascia.—A wound two inches long over back of left wrist joint, the wound extending through skin and fascia, the skin retracted much, and made a gaping wound by flexion of the joint.—A wound in the posterior aspect of the left thigh, four and one-half inches long, and extending through skin and fascia and muscle, about three inches deep, and near the centre of said wound the direction was longitudinal.—A wound on the outer aspect of left thigh, two inches below the trochanter.—A wound over the left gluteal region, one and one-fourth inch long and one-third of an inch deep."

The medical testimony, as is not unfrequently the case, discloses a diversity of opinion among the witnesses upon several important questions, though in many respects there is no substantial conflict between them.    Drs. Campbell, Raynor, Dougall and Richards were introduced in chief, by the People.    Campbell and Dougall examined the body of the deceased the morning after his death, and before its interment. The examination made by Dr. Oakes was after the body had been disinterred, and was made for the express purpose of ascertaining with certainty the exact character and location of the wounds.    The examination by Campbell and Dougall was doubtless chiefly for the purpose of determining whether the wounds were mortal, so they could speak with certainty before the coroner's jury as to the cause of death.    It is evident they made no record of the examination, and their testimony before the trial court shows they had an imperfect recollection of many important matters connected with the wounds, as bearing upon the question whether they were self-inflicted ·or not.    While their examination was sufficiently careful and accurate for the purposes for which it was made, yet, for the reasons stated, that made by Dr. Oakes is more complete and satisfactory in its bearing upon the present inquiry.    Dr. Dougall, who assisted Dr. Campbell, and who substantially agrees with him as to everything relating to it, says: "I did not make a memorandum of the exact locality of the wounds, nor did I charge my memory fully with it." Drs. Campbell and Dougall make thirty-one wounds, answering in the main those specified by Drs. Oakes and Stiner, while the latter make thirty-three; but this difference in results is a matter of no special significance,. except as it may tend to show the care with which the examinations were respectively made.    The former claim to have found wounds on the palms of the hands, and one about the gluteal region that extended into the pelvic cavity.    The latter are quite positive there were no wounds at all in the palms of the

hands, or either of them, and also that the wound in the gluteal region did not extend into the pelvic cavity. The latter wound they insist was a mere flesh wound, extending inwardly three-quarters of an inch, only. This discrepancy is of more importance, but for reasons already stated, the conclusions reached by Drs. Oakes and Stiner are more probably correct. In making this statement it is not intended to at all question the integrity or motives of Drs. Campbell and Dougall. No doubt the conflict in question is the result of an honest mistake, which might well have happened with any one making an examination, under the circumstances, for the purpose they did.

Under this state of facts the question is presented, What are the probabilities as to who inflicted the wounds found upon Anderson's body, and of which he is conceded to have died?— were they self-inflicted, or were they made by the hand of Mooney? In attempting to answer this question, the important inquiry first arises, Was it possible for Anderson to have made the wounds with his own hands? It seems clear, from the evidence, he might, with a knife in one or the other of his hands, have inflicted every wound found on his body, provided he was not prevented by loss of physical strength before the operation was completed. This, in effect, is admitted. Nevertheless, it is claimed by the People the wounds could not have been self-inflicted, because, as is alleged, if the wound in the heart,—the most fatal one,—had been first made, death would have followed almost instantaneously, and before the deceased could possibly have inflicted the others. On the other hand, it is contended if the less important wounds had been inflicted first, whatever the order of their infliction may have been, they would have so shocked and weakened him that he could not possibly have inflicted the wound in the heart,—and in this position the People are sustained by the opinions of Drs. Campbell, Raynor and Dougall, as expressed in their examinations in chief; but the

force of their opinions is greatly weakened by admissions on cross-examination, and references to cases admitted by them to be authoritative in the medical profession, which are somewhat inconsistent with the opinions expressed by them. On the other hand, Drs. Oakes, Alexander, Hosmer, Curtis and Kiernan, witnesses called by the accused, and Dr. Richards, a witness called by the People, swear that all the wounds in question might have been made by the deceased himself. Thus it is satisfactorily shown, by the decided weight of evidence, that the deceased may have inflicted the wounds himself.

Strange as this case confessedly is, assuming Mooney to be guilty, one of the most remarkable features of it is, that he should, by mere chance, have made thirty-three wounds on the person of Anderson, scattered over various parts of the body, without making a single one which Anderson himself could not have made. All these wounds, with the exception of three or four, were light and unimportant, some of them extending barely through the skin; and so far as they indicate any intention at all, they would seem to have been inflicted for purposes of mutilation and torture, merely,—just such wounds as an insane suicide would be most likely to inflict.

Turning now to the accused, it may be admitted it was physically possible for him to have made the wounds; but the important point is, What are the probabilities? In determining this question many things are to be taken into account, particularly the size of the cell, the articles of furniture it contained, the size and construction of the bunks, the condition of the bed clothing, wearing apparel of the accused and deceased, and of the cell floor, after the affair was over. Were the parties in their respective bunks while the deed was being done? The location and character of the wounds show this was physically impossible. Moreover, the fact that the bed clothing on the bunk of the deceased was,

with the exception above mentioned, free from blood stains, demonstrates the wounds could not have been inflicted while he was in his bunk; and for the same reason the deceased could not have been in the bunk of the accused when the cutting was done. He must therefore have been on the floor, and if the cutting was done by Mooney, he, of necessity, was · on the floor also, for he could not possibly have made all the wounds from his bunk. To have done the cutting on the floor, he was necessarily in very close proximity to the deceased,—and how could all this have been done without getting more or less blood stains upon his shirt and drawers? As already seen, the body of the deceased, next morning, was saturated with blood, and, as the evidence shows, there was a great deal of blood on the floor, yet none was found on the accused, except a small spot or two on one of the legs of his drawers, which he accounted for by saying he supposed the deceased had probably touched him with his hands while accused was lying in his bunk. This conjecture was not at all improbable, but the stain is more likely to have been caused by his drawers coming in contact with blood on something in the cell or on the walls of the cell, when he got out of his bunk that night. Grant, in his testimony, expressly states "there was a great deal of blood on the floor  *  *  *  and blood on the walls of the cell." Considering there was only about twenty-six inches space between the bunks and the opposite wall, which had more or less fresh blood on it, it would have been even remarkable if the accused had got down out of the bunk and passed out of the cell without getting any stains on his clothing. No importance or significance is therefore to be attached to the stain on the leg of his drawers.

Again, assuming the cutting was done by Mooney while both parties were out of their bunks, and that there was a great deal of blood on the floor, as stated by Grant, is it not morally certain that Mooney would have got more or less of

it on his feet, and by that means have stained the bed cloth-ing on his bunk? Yet no such stains were found there. But conceding this to have happened by some strange and unac-countable means, how was it possible for him to do all the cutting and carving it is claimed he did, without getting a single stain of blood upon his shirt or even his hands? And yet, in order to sustain the judgment below, this court must say all this, strange and unreasonable as it is, not only hap-pened, but that there is no reasonable doubt of the fact!

But suppose, for the purposes of the argument, all this be conceded, and the case is to be considered upon the hypothe-sis that Mooney did the cutting and that Anderson was sane at the time, as it is claimed he was, and that he was making such resistance as his physical strength and judgment en-abled him to, would it not have resulted in such a deathly struggle and rencounter between them as would certainly have attracted the attention of the guard and every one in that locality? Would not something else have been heard besides wild, inarticulate shrieks or groans, such as are de-scribed by the witnesses in this case? Yet nothing of this kind was heard by any one. Not only so, but, all the circum-stances considered, it is manifest that no such struggle could have taken place. Looking at the case from this aspect, the narrowness of the space in which the parties would have had to grapple with each other; the fact that it was in part occu-pied by-the two stools, water bucket and slop pail; also, that on one side of this space were the iron bunks, even a slight touch of which, in a struggle of that kind, would most likely have left its mark on the body,—must all be kept in view. Think of a deathly struggle at the early hour of half-past nine, in that narrow, crowded cell, over stools, bucket and slop pail, without any one hearing or knowing anything of it! Think of such a struggle, under such circumstances, without leaving a single bruise or mark on either of the parties, to show it had taken place! Would it not be taxing human credulity

26—111 Ill.

beyond all reasonable limits, to ask one to believe that this might have happened? Of the thirty-three wounds on the deceased, not a bruise or contused wound is to be found among them, and, so far as the evidence discloses, not a scratch, abrasion of the skin, or mark, was found on the defendant. Surely, this could not have been, had such a collision really taken place. But this is not all. Turning to the wounds themselves, it is found that most of them must have been inflicted by blows or thrusts given from right to left, indicating both method and deliberation, which, in connection with the fact already stated, that most of them are so slight and trivial as to indicate a purpose of mutilation, merely, strongly negatives the fact there was a personal struggle or collision between the prisoner and the deceased. If, then, there was no struggle, we must, upon the hypothesis of Mooney's guilt, assume that Anderson quietly and without resistance submitted to the butchery,—a position still more unreasonable than the other, and therefore inadmissible.

Leaving this branch of the case, and turning to the question of the prisoner's insanity, it must be conceded the case made by him is a strong one. As bearing on this question, the testimony of the accused, his deportment, manner of testifying, and general bearing throughout the whole affair, are not without significance, and greatly strengthen his case. In addition to this, the evidence shows that his mother, before him, was insane, that he had a cousin, on his father's side, who was also insane, and that he himself, when fifteen or sixteen years of age, had fits, and was subject to illusions. Add to this the positive opinions of eminent medical experts that Mooney, at the time in question, was an epileptic lunatic, and the case is yet still stronger. The opinions of these medical witnesses seem to be strongly fortified by medical authority, and the witnesses themselves are evidently men of great learning and research. It is true, other medical witnesses expressed contrary opinions, and gave it

as their best judgment the prisoner was sane, and consequently responsible for his acts. If this case turned upon the weight of expert testimony upon this question, merely, a more difficult question would be presented; but it does not, for the wounds themselves, assuming they were made by the prisoner, raise the strongest doubt of his sanity. It is difficult to conceive of a motive, and surely none has been shown, that would induce a sane man to inflict between twenty and thirty mere flesh wounds upon various parts of the body, as was done in this case, when the sole object was to take life to rid himself of a mere petty annoyance, as is claimed was done here.

It is not necessary to further discuss this branch of the case. It may be concluded by the general remark, that, to say the least of it, the question is not free from well founded doubt if it be assumed the killing was done by the prisoner. Indeed, from every aspect in which the case is capable of being viewed, grave and serious doubts of the prisoner's guilt are encountered. Such being the case, what is the law applicable to it? Fortunately, there is no diversity of opinion or conflict of authority with respect to it. A conviction is asked in the case upon circumstantial evidence alone. The unquestioned rule in such case is, that before conviction can properly be had, the guilt of the accused must be so thoroughly established as to exclude every other reasonable hypothesis. This has not been done. The whole case seems shrouded in mystery and doubt to such a degree that it would be dangerous to permit the conviction, and it should therefore be reversed.