## F. C. KELLER

### v.

### THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed October 26, 1903.*

APPEALS AND ERRORS—*when Supreme Court will reverse judgment of conviction.* The Supreme Court will reverse a judgment of conviction where the evidence is of an unsatisfactory character, and so greatly preponderates in favor of the accused as to indicate that the verdict is the result of passion or prejudice on the part of the jury.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. A. H. CHETLAIN, Judge, presiding.

On August 2, 1902, an indictment was returned in the criminal court of Cook county charging plaintiff in error, in three counts, with the crime of rape on July 1, 1902, in and upon a female child named Bessie Lamb, of the age of thirteen years. At the September term, 1902, of said criminal court, a plea of not guilty having been entered by defendant below, the cause was brought to trial before a jury. The jury found the defendant guilty of rape, and his punishment was fixed at imprisonment in the penitentiary for the term of four years. Upon the rendition of the verdict a motion for a new trial and a motion in arrest of judgment were overruled and judgment pronounced upon the verdict. The case is brought to this court for review by writ of error.

The prosecution produced three witnesses who testified on the trial below, namely, Bessie Lamb, (the prosecutrix,) her mother, Alice Lamb, and a police officer named John Quinn. The statement of what a Dr. McNamara would testify to if present was admitted in evidence on the part of the People.

Bessie Lamb, on her direct examination, testified that she was thirteen years old; that she lived at 643 Sheffield avenue, in the city of Chicago, and had lived there for

the past year; that plaintiff in error owned a livery stable on Lincoln avenue, and that she had known him for two years. She fixed the date of the last time she was at his stable in various ways, viz.: that it was two weeks before he sold out; this sale was made on May 12, 1902, but the business continued under the name of plaintiff in error until June 6, 1902; that it was about two months before the trial, which would fix the date of the occurrence about July 11; that it was about three or four weeks before the public schools closed; the date of the closing of the schools, according to her testimony, was July 25, 1902. She further testified that she went up a ladder to a room where Keller slept, over his office in the livery stable; that he said nothing to her about going up above the office; that he asked her how she felt, and that was all that was said; that he followed her up-stairs, and there had sexual intercourse with her on a cot in a room above the office where plaintiff in error was in the habit of sleeping; that she does not remember anything that was said up-stairs; that he went down first and she followed in about five minutes; that she never told anybody anything about what happened; that the first time she spoke to anybody about what occurred there was "when the policeman came," but does not remember when that was. On her cross-examination she testified that she lived a block from the stable; that she had been around there before this time and had been ordered away from there by a Mr. Regner a number of times; that on the afternoon of the day in question she was going to the store past the stable and Mr. Keller motioned to her to come in, and that she went in; that he had promised her and another girl to take them a ride, and that she thought he would give them a ride before they left the stable; that nobody was with her, but she was going over to get the other girl; that when she went in it was daytime; that there were not very many people around there, but there were other men working around

in the stable; that she saw them when she went in but did not know whether they saw her; that there was nothing to prevent them from seeing her; that Mr. Keller told her to go up on that ladder and she went; that he didn't tell her why she should go and she didn't ask him why; that she didn't cry; that nothing hurt her, and there were no stains on her person or drawers and nothing wet on her; that before she went down he said for her to wait until he went down and saw that it was all right. She testified that she knew a man by the name of Joe Keller, who worked in that livery stable, and was asked the following questions and gave the following answers:

Q. "Did you tell the police that it was Uncle Joe that had done something to you?

A. "I said there was a man that we called Uncle Joe.

Q. "Didn't you tell the police that it was Uncle Joe Keller that had done something to you?

A. "I didn't tell him his last name, because I didn't know his last name.

Q. "Now, then, I am asking you, didn't you tell the police officer that it was a man by the name of Uncle Joe Keller that had done something to you?

A. "I didn't say which Keller; no, sir. I didn't tell him it was Uncle Joe Keller; no, sir.

Q. "Did you say it was Uncle Joe?

A. "Yes, sir."

The only testimony given by Alice Lamb was that Bessie Lamb, her daughter, was thirteen years old on June 22, 1902.

John Quinn testified that he was a police officer; that he first saw Bessie Lamb on the 31st of July, 1902, at the station. The following appears from his testimony in chief:

Q. "Well, was any complaint made to you at that time by Bessie Lamb?

A. "Yes, sir.

Q. "With reference to what, officer?

A. "She complained that she had intercourse."

The latter question was answered over the objection of plaintiff in error, and an exception was duly preserved to the ruling of the court thereon. The witness further stated that nothing definite was said by her as to time or date.

The statement of Dr. McNamara was that he "had examined Bessie Lamb on August 7, and found her parts large enough to accept of the male organ; that there were no lacerations, or anything of the kind."

The defendant testified that he was thirty-nine years of age; that he had never before been arrested for any offense or charged with crime; that he had conducted this livery stable for nine years, lacking a month; that he sold the stable at auction on May 12, 1902, but continued there, and the stable was conducted under his name until the 6th of the following June; that he did not take Bessie Lamb during the months of May, June or July up in his office or any place in the stable and have intercourse with her; that he never caressed her or had anything to do with her; that he had seen her around there for some time, the same as other children, and had told her many times to go away, the same as other children; that he had never had any intimacy or attempted to have any connection with her; that he never put her on his bed, or anything of that nature; that he had a man working for him named Joe Keller, who was thirty-four years old, and that Bessie Lamb would always ask for him when she came to the stable; that she never talked to plaintiff in error much.

Eight witnesses were produced by plaintiff in error, all of whom testified that his general reputation as a peaceable, quiet and orderly citizen was good. These witnesses were composed of three physicians, a merchant, painter, shoe repairer, insurance and loan agent and an engraver.

DAVID, SMULSKI & McGAFFEY, for plaintiff in error:

The testimony is of such a character as to be wholly unsatisfactory and leaves it extremely doubtful whether the defendant is guilty of any crime, in which case this court will always set aside the verdict. *Clark* v. *People,* 111 Ill. 404; *Mooney* v. *People,* id. 388; *Hoyt* v. *People,* 140 id. 588; *Campbell* v. *People,* 159 id. 9; *Duffy* v. *People,* 197 id. 49; *Waters* v. *People,* 172 id. 367; *Cohn* v. *People,* 197 id. 482.

The evidence of the prosecutrix is without any corroboration, and the defendant having denied the charge, the conviction should be set aside. *Stevens* v. *People,* 158 Ill. 118; *Gifford* v. *People,* 148 id. 173; *Fisk* v. *State,* 9 Neb. 62; *People* v. *Benson,* 6 Cal. 221; *Topolanck* v. *State,* 40 Tex. 160; *Mares* v. *Territory,* 65 Pac. Rep. 165; *Matthews* v. *State,* 19 Neb. 330; 1 Wharton on Crim. Law, (9th ed.) sec. 165; 1 McLain on Crim. Law, sec. 458; *Bean* v. *People,* 124 Ill. 576; *People* v. *Duncan,* 104 Mich. 46.

The testimony of police officer Quinn that the witness Bessie Lamb had on July 31 complained to him of intercourse, was hearsay, did not tend to identify the alleged offense charged, was immaterial and very prejudicial, and was not such a complaint as is admissible on a charge of rape. *Stevens* v. *People,* 158 Ill. 111; 1 Wharton on Crim. Law, (9th ed.) sec. 566.

H. J. HAMLIN, Attorney General, and CHARLES S. DENEEN, State's Attorney, (F. L. BARNETT, and F. L. FAKE, of counsel,) for the People.

Mr. JUSTICE SCOTT delivered the opinion of the court:

This conviction rests upon the testimony of the prosecutrix alone. She is wholly uncorroborated in regard to any material contested question. The prosecution sought to sustain her testimony by showing that she made complaint. It is impossible to tell, from her testimony, when the alleged offense was committed. She first fixes the time at about two weeks before plaintiff in error sold the livery stable, which, fixing the latest date

possible, by calculating from the time when possession changed, would not be later than May 23, 1902. She afterwards fixed it at two months prior to the time of the trial, and again at three or four weeks before the close of the school year. These two latter statements would fix the time some time between June 27 and July 10. She states that she did not tell anybody until the policeman came. It does not appear what policeman she referred to, when or where he came nor where she was at the time she told him about the matter, but she says, on cross-examination, that she told him that it was "Uncle Joe" that had done something to her, thereby referring to an employee in the livery stable by the name of Joe Keller. With the record in this condition, the People called one John Quinn, a police officer. He testified that he saw Bessie Lamb on the 31st day of July, 1902, at the Sheffield avenue police station, and at that time "she complained that she had intercourse," but she did not definitely say anything in regard to the time or the date of the occurrence. It does not appear in the case at bar that the complaint which Quinn testified about was a complaint in reference to the occurrence for which plaintiff in error was then being tried, nor does it, in fact, appear that Quinn is the person to whom the prosecutrix says she related her wrongs. For aught that appears, Quinn may be the policeman to whom she stated that it was "Uncle Joe" that had done something to her, while the jury may have concluded that the complaint which Quinn heard was a complaint of the conduct of the plaintiff in error, —a conclusion wholly unwarranted by the evidence.

The prosecutrix further testified, in substance, on cross-examination, using language which it is unnecessary to set out here, that she might be mistaken about penetration having taken place. It appears from her testimony that the offense was committed in the daytime, in a livery stable on a public street; that she saw persons in the livery stable as she went in, and that there
204—39

was nothing to prevent such persons seeing her. None of these persons were called on the part of the People nor is their absence in anywise accounted for. Her testimony abounds in uncertainties and contradictions about other material matters, less vital to the determination of this cause, however, than those herein above referred to.

On the part of the accused it was shown that he had resided in the same vicinity for several years, and it was proved by witnesses of unquestioned respectability and good standing that he had during that time been of good reputation as a law abiding citizen. He testified in his own behalf and emphatically denied the charge made by Bessie Lamb, and his testimony was in no manner weakened or impeached. The failure of the prosecutrix to fix the time when the offense was committed put it beyond his power to account for his whereabouts or to show how he was engaged at the time when she claims the wrong was perpetrated. He presented as complete a defense to this charge as any man, however innocent, would ordinarily be able to present to an accusation of this character, surrounded, as this one was, with such uncertainty in regard to time and persons who were in the vicinity at the time of the alleged commission of the crime. The uncertainties of Bessie Lamb's testimony in these particulars, which ordinarily would weaken the cause of the prosecution, in this instance seem to have been a bulwark of strength, by making it impossible for the plaintiff in error to meet her testimony by any evidence save his own denial and proof of his previous good character.

While this court is to the fullest extent committed to the doctrine "that the jury, in their deliberations, are the judges of the facts and the weight of the evidence in all criminal cases," yet this court will not hesitate to reverse a judgment of conviction in a criminal case where the evidence on which it is based is of an unsatisfactory character, and where the evidence in the case so greatly preponderates in favor of the defendant that after a pa-

tient consideration thereof there remains such grave and serious doubt of the guilt of the accused as leads to the conclusion that the verdict of the jury is the result of prejudice or passion, and not of that calm and deliberate consideration of the evidence which the law requires. *Mooney* v. *People*, 111 Ill. 388; *Clark* v. *People*, id. 404; *Campbell* v. *People*, 159 id. 9; *Waters* v. *People*, 172 id. 367.

In our judgment the evidence contained in this record is not sufficient to support a verdict of guilty, and a new trial should have been granted.

The judgment of the criminal court will be reversed and the cause remanded to that court.

*Reversed and remanded.*