(No. 12713.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* R. R. FOSTER *et al.* Plaintiffs in Error.

*Opinion filed June 18, 1919.*

1. CRIMINAL LAW—*when statements are inadmissible to corroborate testimony of witness.* Statements or declarations as to the act of a party or witness in corroboration of his theory of the case or any fact favorable to him, whether oral or in writing, are, as a general rule, inadmissible in evidence on his own behalf, except where they are a part of the *res gestæ* or made in the presence of the other party.

2. SAME—*when alleged stolen articles are admissible in evidence.* Where defendants are charged with burglarizing a store, articles of merchandise found the next morning upon a public highway which the burglars might have traveled in leaving town in an automobile are admissible in evidence.

3. SAME—*when jury may be allowed to separate during trial.* Unless sufficient cause is shown why the jury should be kept together, the trial court may exercise its discretion in allowing the jury to separate during the progress of the trial of a criminal case for less than a capital offense, provided the jury are properly instructed concerning their duties while separated.

4. SAME—*word "permitted" may be used in an instruction as to right of defendant to testify.* The word "permitted," used in an instruction stating that the "defendant is permitted to testify in his own behalf," is not misleading or erroneous.

5. SAME—*Supreme Court is not bound to search for errors.* It is no part of the duty of the Supreme Court to search for errors or of its own motion to enter upon an investigation in order to find material upon which to base a judgment of reversal.

6. SAME—*instructions may be given as modified, without being re-written.* Section 74 of the Practice act implies that written instructions may be given as modified, and while it is not good practice to modify instructions so that the portions attempted to be erased still remain legible, such modifications, if not misleading, will not reverse the case.

7. SAME—*indictment constitutes no evidence of guilt.* An indictment is merely an accusation or charge against the accused as brought by the grand jury and is not in itself evidence of guilt, but the State must show to the satisfaction of the jury, beyond a reasonable doubt, that the accused is guilty as charged.

8. SAME—*instructions should be read as a series—erasures.* Instructions should be read as a series, and in determining whether the jury were misled by the giving of an instruction containing a sentence stricken out with a pen but still legible, the instruction should be considered with other instructions on the same subject.

9. SAME—*when judgment of conviction will not be reversed on evidence.* Unless the Supreme Court is able to say, from a consideration of the whole testimony, that there is clearly a reasonable doubt of the guilt of the accused it will not interfere on the ground that the evidence does not support the verdict.

WRIT OF ERROR to the Circuit Court of Logan county; the Hon. T. M. HARRIS, Judge, presiding.

EDMUND BURKE, and H. F. TRAPP, for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, C. EVERETT SMITH, State's Attorney, and FLOYD E. BRITTON, (McCORMICK & MURPHY, of counsel,) for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

R. R. Foster, James Clinton and Albert Wehr were indicted by the grand jury of Logan county upon the charge of burglary and larceny. After a trial the jury returned a verdict finding them guilty as charged in the indictment, and they were sentenced to the Southern Illinois State Penitentiary for not less than one year nor more than twenty years, until discharged according to law. From that judgment this writ of error has been sued out.

L. Burchett & Son, a partnership, were general merchants in the town of New Holland, in the western part of Logan county. They handled groceries, clothing and furnishings for men and women, dry goods, boots and shoes, trunks, silverware, etc. On the evening of December 10, 1918, they closed and locked their store at about nine o'clock. Stuart Robinson, a clerk, arrived to open the store the next morning at six o'clock and discovered that

the building had been burglarized and a large quantity of merchandise taken. He found on the sidewalk near the side door of the store three iron bars which had been taken from a railroad car standing on the side-track of the Illinois Central Railroad Company about a block away, and the doors showed evidence of having been forced open by the use of these bars. Among the things taken from the building were a flat-top trunk, a basket containing three or four dozen eggs and several bars of butter wrapped in white paper. The Burchett store faces south on Lincoln street, and Mason street runs along its west side. Two blocks east of Mason street another street runs parallel thereto, having a closed or blind end at the railroad tracks, about a block south. Not far north of the closed end is located an establishment conducted by John Mangold where cement blocks were manufactured, and against the side of the building was a pile of the cement blocks. The tracks of an automobile could be recognized in Mason street, where the car had apparently been run up at right angles to the sidewalk on the west side of the store near the side door, which had been broken open. Mangold also found on the morning of December 11 tracks of an automobile in his cement yard, and on the face of the pile of cement blocks, up to which the tracks led, was a mark about forty inches from the ground, and there were marks on the blocks at two places lower down. The clerk, Robinson, also found in this cement yard early that morning some dry goods and ladies' hand-bags which contained the marks and tags of the firm. About six o'clock on the morning of December 11 plaintiffs in error Foster and Wehr came to the home of George Hobkirk, a farmer residing a few miles northeast of Williamsville, in Sangamon county, and asked to telephone, saying their truck had broken down up the road and they wanted to get some help. Foster talked to one Dawson, in Springfield, and asked him to send an auto to pull them in. The broken car was then at or near a road inter-

section about a quarter of a mile east of Hobkirk's house. It had a top and the curtains were down. Foster told Hobkirk and his son his name and mentioned people whom he knew, apparently making correct statements as to these matters. Hobkirk's home is about twenty miles northeast of Springfield and about the same distance southwest of Lincoln. Springfield is about forty miles southerly from New Holland. One of the witnesses for the State, Fred Knollenberg, driving on the east and west road connecting New Holland and Lincoln about seven o'clock in the morning of December 11 found some ladies' silk hose in the road. One Sample, a farmer, residing east of New Holland, found on the same morning, about three and a half miles south and east of New Holland, a piece of crepe de chine. Another witness, McCarthy, on the same morning, about 6:40 o'clock, found in the road several miles east of New Holland two pairs of gloves. Some of these articles had on them marks and tags of L. Burchett & Son. The point at which Knollenberg found the silk hose was some six or seven miles east of New Holland and almost due north of the place where plaintiffs in error were found on the morning of December 11, about six o'clock, in the road near the home of Hobkirk. Wehr was employed by Jacob Kauth, of Springfield, as a deliveryman for his grocery store, located in the extreme north end of Springfield. Wehr lived in the city and kept his employer's car at the place where he lived. Kauth had owned the car, an Overland fitted with a truck body, for some six months and had tried to run it in his delivery work but was unsuccessful and had several accidents, and therefore hired Wehr, who apparently was an experienced chauffeur, to run it for him.

Foster was the only one of the three plaintiffs in error who testified, and, with the exception of one other witness, was the only witness who testified as to the whereabouts of any of them on the night of December 10. Foster stated that on the evening of December 10 he made arrangements

with Wehr to meet him at 4:30 the next morning and go hunting rabbits when those animals got out into the road in the early morning; that he went to bed in his room about one o'clock and got up about four o'clock, went to the Ballard-Johnson Company's restaurant, in Springfield, where he had previously made arrangements with Farnback, the man in charge, to have a lunch ready for himself and party at 4:30; that about that hour he called for the lunch, which was prepared, and took it with him in a basket and put it into the car when he met Wehr. The evidence is not clear as to where Clinton joined them, but evidently it was in Springfield. Farnback testified that Foster called for this lunch about 4:30 on the morning of December 11. Foster stated that after the three people were in the car they drove north to Williamsville and went about a mile north of the place where their car later broke down, near Hobkirk's farm, and then, because Wehr wanted to get back to Springfield in time to go to work that day, they decided not to go any farther and turned around and started south. He testified they were no nearer New Holland at any time on the night in question than a short distance from where the car was broken; that they had no merchandise of any kind in the car and no basket except the one containing the eggs and sandwiches for their lunch; that there was nothing in the rear of the car at the time it was broken except a common box and a lap-robe, upon which Clinton was sitting. Foster further testified they had shot but one rabbit before the car broke down.

When Foster went to Hobkirk's house and telephoned Dawson to send a truck out to haul them into town, Dawson promised to do so. Dawson had formerly been in the saloon business in Springfield and was then running a soft drink place and apparently had nothing to do directly with the auto business. He, however, called up Charles L. Adams, manager of a transfer company in Springfield, and asked him to send a truck out to the Hobkirk place and

get the axle of a broken car. Adams directed one of his employees, Louis Newman, to go to the Hobkirk farm and bring in the broken axle. Newman, in a Ford car, went from Springfield about seven o'clock in the morning of December 11, pursuant to the directions given by Adams, through Sherman and Williamsville to the home of Hobkirk and was there directed to the truck in question. He found it in the middle of the north and south road, headed south, near a road intersection. Wehr was walking up and down the road and Foster got out of the car, telling Newman that the car was broken. There was another man lying down in the truck, immediately back of the seat, on something with a flat top, extending across the truck apparently next to the seat and about three inches above it. The truck had side curtains extending from the windshield to the rear and had a rear curtain, all of which were down. It had one seat and the tool-box was under the seat. Newman had occasion to use a wrench from the tool-box and held the curtain up, and also held the seat while one of the plaintiffs in error procured the wrench. He testified that while doing this he saw a market basket in front of the seat upon the floor of the car which contained three or four dozen eggs, and that the same basket contained three or four bricks of butter wrapped in white paper. He also testified that the box or trunk the man was lying on in the car was covered with a lap-robe or black cloth, which also covered the contents of the car back of where the man was lying, and that the top of the thing that the man was lying on was two or three feet above the sides of the car; that the top of the contents of the car back of that extended about a foot above the sides of the car; that he could not see what the contents of the car were under the black covering. Newman further testified that when he went out to where the car was, he understood from the instructions given him that he was to bring in a broken axle and not to bring in the car, and that when he was informed that

he was to haul the car in, stated that he could not do it
with the Ford truck, as it was not big or strong enough,
and that therefore he soon started back to Springfield.  Fos-
ter rode with Newman as far as Williamsville, where he
left the car and Newman proceeded to Springfield.  New-
man testified that he saw Foster, as he got out of the car,
put a revolver in his pocket.

Foster boarded a Chicago and Alton train that pulled
into the station at Williamsville soon after he got out of
Newman's car and went on to Springfield and to the garage
of Harry Kutscher, where he made arrangements with Kut-
scher to haul in the crippled car.  In accordance with this
arrangement Kutscher drove a truck out to the car, ar-
riving shortly before twelve o'clock, Foster accompanying
him, and he hauled the car to Springfield, arriving there
about one o'clock.  On the return to Springfield Foster rode
with Kutscher and Wehr and Clinton rode in the disabled
car.  Foster directed Kutscher to leave the car in the alley
between Washington and Jefferson streets and Eighth and
Ninth streets in Springfield, which was very near the place
then run by Dawson.  When Kutscher got out to the Hob-
kirk farm the curtains of the disabled car were all down
and Clinton was in the car.  At 10:30 on the evening of
December 11, upon the order of Wehr, Kutscher's firm re-
moved the truck from the alley to their garage and it was
there repaired.  On December 13, on the order of a mem-
ber of the Springfield police force, the car was taken to
a garage next door to the police station in Springfield,
where it was later examined by Oscar Burchett, one of the
Burchett firm, and John Mangold, manager of the cement
yard.  They found that the car at the rear end showed
scars, scratches and abrasions, with particles of cement at
points corresponding in a general way, in distance from the
ground, to the marks on the cement blocks in Mangold's
cement yard at New Holland.  The testimony tends to show
that Foster, although according to his testimony he had no

interest in the car other than that he had been riding in it, gave all directions and instructions concerning bringing in the car from the place where it was disabled and as to where it should be left in the alley across from Dawson's place of business, and that Wehr, although according to Foster's testimony he was in charge of the car, gave practically no directions or instructions whatever concerning the hauling in of the car or its disposition after they reached Springfield; that the first order he gave was at 10:30 on the evening of December 11, when he ordered the car taken to Kutscher's garage for repairs. The testimony also tends to show by practically every witness who saw the car in its disabled condition while near Hobkirk's farm, that the curtains were drawn down all around it all the time, and that Clinton, whenever he was seen, was in the car. We find no direct evidence in the record as to the whereabouts of Wehr and Clinton on the night of December 10 prior to 4:30 the next morning, when Foster testified he went with them in the car from Springfield to Hobkirk's farm.

When the manager of the Springfield restaurant, Farnback, testified that he sold plaintiff in error Foster a lunch and delivered it to him on the morning of December 11, counsel for plaintiffs in error attempted to introduce a written report or sheet of sales which Farnback testified he had kept on the night in question. This report did not show to whom the sales were made but only the date and amount. The court refused to admit it in evidence. The report did not show or tend to show in any way whether Foster was in the restaurant on the morning in question. It does tend to show that Farnback was there, but that is not disputed. If this report was admissible for any purpose it was for the purpose of corroborating Farnback's testimony. Statements or declarations as to the act of a party or witness in corroboration of his theory of the case or any fact favorable to him, whether oral or in writing, are, as a general rule, inadmissible in evidence on his own behalf except

where they are a part of the *res gestæ* or made in the presence of the other party. (1 Ency. of Evidence, 383; Jones on Evidence,—2d ed.—secs. 235, 236.) This report was, in its nature, self-serving, and we cannot see what bearing it would have on any of the material issues of the case. It was rightly excluded.

Counsel for plaintiffs in error also argue that certain goods alleged to have been taken from the Burchett store and found thereafter on the public highways were improperly admitted in evidence, as they were not sufficiently identified and were not found on the direct road between New Holland and Springfield. There was testimony in the record to the effect that a portion of the direct road immediately south of New Holland to Springfield was in a bad state of repair on the night in question, and these goods were found scattered along the highway running east from New Holland to the north and south road upon which the disabled auto was found in the possession of plaintiffs in error. We think the articles were sufficiently identified to be admitted in evidence for what they were worth. All the evidence was before the jury, and they could judge whether or not the articles were any of the stolen goods and also to show the route the burglars had taken with the stolen goods. We see no error in their introduction.

It is urged, also, in this connection by counsel for plaintiffs in error that it was error to admit the testimony as to the measurements and condition of the car at the police station in Springfield without in some way requiring evidence to connect that car with plaintiffs in error, and without, as we understand the argument, more definite evidence as to the markings upon the rear of the car in connection with the scratches or markings upon the cement blocks in Mangold's cement yard. The testimony as to the car that was examined by Mangold, the manager of the cement yard, sufficiently identified it as the car used by plaintiffs in error, the markings on the car and the cement blocks.

Counsel for plaintiffs in error also urge that the trial court committed error in permitting the jury to separate during the recesses of the court while the trial was going on. No question of this nature was raised before the verdict of the jury was received. Furthermore, the law is settled in this State that the trial court may exercise its discretion in allowing the jury to separate during the progress of a trial in a criminal case less than capital unless sufficient cause is shown at the trial why the jury should be kept together, the trial court properly instructing them concerning their duties while separated. (*People* v. *Stowers,* 254 Ill. 588; *Sutton* v. *People,* 145 id. 279.) The record shows that the jury were properly instructed by the trial court before they were allowed to separate. On this record the court did not commit error in so allowing them to separate.

Counsel for plaintiffs in error earnestly argue that the trial court erred in giving the second instruction for the People. This instruction deals with the credibility of a defendant in a criminal case. The objection of counsel for plaintiffs in error is to the wording of one of the sentences, to the effect that "the jury are not bound to accept of the defendant's statements upon the witness stand as to the truth." We do not see that there is any substantial difference between telling the jury that they are not bound to believe the testimony of the defendant and telling them that they are not bound to accept his statements as to the truth. It is also strenuously insisted by counsel that the first sentence of the instruction is wrong because it contains the word "permitted" or "permission" in a clause which stated that "defendant is permitted to testify in his own behalf, but by such permission, under the statute," etc. The word "permitted" or "permission" was used in similar instructions which were held rightly given in *Hirschman* v. *People,* 101 Ill. 568, *Rider* v. *People,* 110 id. 10, and *Padfield* v. *People,* 146 id. 660. The identical instruction so complained of

was given on behalf of the State in *People* v. *Turner*, 265 Ill. 594, as the record in that case shows although it is not shown in the opinion. While all of the criticisms made in the briefs in this case were not there passed upon by the court, the instruction in that case was held not misleading or erroneous. While it might be held that the wording of the instruction in question might be improved upon, we do not think it misled the jury in any of the particulars claimed by counsel for plaintiffs in error. The reasoning of this court in *People* v. *Turner, supra, Padfield* v. *People, supra,* and *People* v. *Duzan,* 272 Ill. 478, fully answers the criticism of counsel as to the misleading character of this instruction.

Counsel for plaintiffs in error further argue that the court erred in refusing instructions "C," "H" and "I" asked on behalf of plaintiffs in error. So far as these refused instructions stated correct principles of law they were covered by other instructions given on behalf of plaintiffs in error.

Counsel further argue that the court erred in giving the instructions as to the form of the verdict, in that such instructions were in such form that the jury would understand they could not find some of the plaintiffs in error guilty and others not guilty. So far as we can ascertain from the record, no request was made by plaintiffs in error to give any instruction clearly stating that one could be convicted and the others not. Furthermore, we cannot see how the jury were misled or any of the plaintiffs in error were injured because of the failure to give such an instruction. Under the undisputed facts in this record, if one of the plaintiffs in error was guilty all were guilty, and if one was not guilty the other two were not.

The trial court was asked on the part of plaintiffs in error to give instruction 7, which reads:

"The court instructs you that the indictment in this case is no evidence of guilt and should not be so considered by

the jury. And no juror should permit himself to be influenced against the defendants because of the fact that an indictment had been returned against them nor because of the nature of the charge made in the indictment."

As given to the jury this instruction had the last sentence entirely stricken out by pen lines drawn horizontally through each line of said sentence, but the lines were so erased that the sentence could still be read and understood by the jury. The first sentence was given without any erasure. It is argued by counsel for plaintiffs in error that this last sentence was so stricken out with a pen by the court, and this seems to be conceded by counsel for the State, although there is nothing in the record to indicate whether the court or counsel erased the last sentence in said instruction. It is most strenuously insisted that the giving of this instruction so modified with this erasure would mislead the jury by causing them to believe that while the indictment is not evidence, still there would be nothing improper in permitting themselves to be influenced by the fact that plaintiffs in error had been indicted and were charged with being burglars. Counsel for plaintiffs in error state that the practice of striking out words in instructions and permitting them to go to the jury in such condition that the words stricken out may be read has often been condemned by this court. However, they cite no authority in support of this statement. We have frequently held that it is no part of our duty to search for errors or enter upon an independent investigation of the court's own motion in order to find material upon which to base a judgment of reversal. (*Wickes* v. *Walden,* 228 Ill. 56, and cases there cited.) While counsel have not pointed out and cited authorities in support of this position we have investigated the point in question. Section 74 of the Practice act (Hurd's Stat. 1917, p. 2244,) in its wording seems plainly to imply that written instructions may be given as modified. Indeed, the only practical way, under this stat-

ute, to avoid this, would be for the trial judge to re-write every instruction that he wished to modify in any way, and with the numerous instructions that are frequently asked by counsel in criminal as well as civil cases, the practice of re-writing all modified instructions by the trial judge would be found very difficult, if not impossible. Somewhat similar questions have been raised in other cases in this court, and so far as we are advised a case has never been reversed solely because the instruction had been handed to the jury as modified by inserting or striking out and without being re-written. (See *Manrose* v. *Parker,* 90 Ill. 581; *Union Railway and Transit Co.* v. *Kallaher,* 114 id. 325; *Cobb Chocolate Co.* v. *Knudson,* 207 id. 452; *Leighton* v. *Chicago Traction Co.* 235 id. 283.) While we do not approve of the practice of modifying instructions so that the portions attempted to be erased still remain legible, manifestly any modification of this kind not necessarily misleading ought not to reverse the case. So long, however, as the laws of this State require all instructions to be in writing when given to the jury, we cannot see how the practice of modifying instructions by the court by erasing a portion and perhaps inserting something in the place of the erased portion and leaving the erased portion in the instruction, in some cases possibly legible, can be prevented in all cases. The erased sentence was a repetition of the same thought that was stated in the first sentence that was left in the instruction unerased and given to the jury.

The doctrine attempted to be set out in this instruction, as originally presented, was, in substance, very similar to the rule frequently stated as to the legal presumption of innocence as to the accused party until his guilt is established beyond a reasonable doubt by competent evidence, and the instruction as modified still was intended to convey something of the same idea. There can be no question that an indictment is merely an accusation or charge against the accused as brought by the grand jury, and is not, in itself,

evidence that the accused is guilty of the crime charged but that the State must still show to the satisfaction of the jury, beyond a reasonable doubt, that the accused is guilty as charged. (*Padfield* v. *People, supra;* 10 R. C. L. 871, and cases cited in notes 10 to 14, inclusive; Jones on Evidence,—2d·ed.— sec. 12.) This rule that the accused must be given the benefit of this presumption of innocence until the jury finally agree upon the verdict was covered by several instructions given on behalf of plaintiffs in error. The instruction given for them immediately preceding the modified instruction complained of, set forth that it was the duty of the jury "to presume the defendants [naming them] not guilty in this case. That it is your duty to give the defendants the benefit of this presumption throughout the trial of the case and when you shall have retired to consider of your verdict. The presumption of innocence attends the accused at every stage of the proceedings until the jury agree upon a verdict. And further, it is the duty of the jury to explain the evidence against the defendants upon the hypothesis or theory that the defendants were not present in New Holland at the time of the commission of the crime charged in the indictment and did not commit such crime, if you can reasonably and consistently do so in the light of the whole evidence." Again, instruction 11 given on their behalf instructed the jury that the defendants were not required to prove their innocence but that the prosecution must prove their guilt of the identical crime charged, in manner and form as charged in the indictment, beyond all reasonable doubt, or else they should be found not guilty. Other instructions given on behalf of plaintiffs in error covered, directly or indirectly, the doctrine of the presumption of innocence and that the accused must be proven guilty beyond all reasonable doubt in order to convict them. It has been repeatedly stated by this court that instructions should be read as a series. Assuming for the purposes of this case that instruction 7 as originally pro-

posed, without any modification, stated correct principles of law, and assuming, also, that the jury understood that the court had modified the instruction by striking out with a pen the last sentence, still we do not see, in view of all the evidence in the case, read in the light of the instructions given along with this modified instruction, how the jury could have been misled in any way to the injury of the plaintiffs in error, or any one of them, by the modification so made. Taking all the instructions together, along with this modified instruction, we think the jury would necessarily understand that the indictment was not evidence, and that the accused must be presumed to be innocent until they were proven guilty by the evidence in the record, beyond all reasonable doubt.

Counsel for plaintiffs in error argue at length that on this record there is clearly a reasonable doubt as to the guilt of their clients; that this court has frequently held that it will not hesitate to reverse a judgment of conviction in a criminal case where the evidence on which it is based is of an unsatisfactory character, (*Keller* v. *People,* 204 Ill. 604; *Newman* v. *People,* 223 id. 324; *People* v. *Martellaro,* 281 id. 300;) or where the conviction was probably due to prejudicial or incompetent evidence. (*Mooney* v. *People,* 111 Ill. 388; *Campbell* v. *People,* 159 id. 9; *Waters* v. *People,* 172 id. 367.) We adhere to the reasoning laid down in the decisions just cited, but we do not think that the reasoning applies on the record in this case. This case, while largely depending upon circumstantial evidence, was one in which it was peculiarly within the province of the jury to say whether or not the circumstances so proven showed that the plaintiffs in error were guilty beyond a reasonable doubt. Instruction 9 given for plaintiffs in error told the jury that if it was possible to account for the facts and circumstances proven by the prosecution upon any reasonable theory other than the guilt of the defendants, consistent with the evidence in the case, then it was the duty

288 – 25

of the jurors to so account for it and find the defendants
not guilty. The theory of counsel for plaintiffs in error on
the trial of the case before the jury and here is, that plain-
tiffs in error went out on the morning of December 11, at
4:30 o'clock, to hunt rabbits as they jumped in and out of
the road, while counsel for defendant in error ridicule the
idea that anyone should from an auto hunt rabbits as they
were jumping in and out of the road in the early morning,
and urge that the jury evidently did not believe the story
of Foster in this regard. There is no question about the
store being burglarized on the night in question and certain
goods taken, and that the burglars were not familiar with
New Holland streets and its surroundings or they would
not have driven the car into the blind street, which necessi-
tated their going into Mangold's cement yard and turning
around. Furthermore, there can be no question that the
burglars, whoever they were, traveled east on the road from
New Holland towards Lincoln as far as the north and south
road upon which the broken car of plaintiffs in error was
seen in the early morning of December 11, adjoining Hob-
kirk's farm. Chauffeur Newman, who was sent out in a
Ford car to give them assistance, testified positively that he
saw in a market basket in the car which was in the posses-
sion of plaintiffs in error, several dozen eggs and some but-
ter bricks. Eggs and butter bricks had been taken from
the burglarized store.

Counsel for the plaintiffs in error seem to concede that
Newman's testimony, if true, tends strongly to show the
guilt of plaintiffs in error, but they argue that he had very
little opportunity to see into the car, and may have been
mistaken both as to the eggs and as to the contents of the
car back of the seat and the box or thing upon which Clin-
ton was lying, and that the testimony of Foster as to the
lunch, as corroborated by the testimony of Farnback, ac-
counted for this basket. It may be said in this connection
that there was no testimony by Farnback that in any way

described the basket in which the lunch was taken away or identified it with the market basket in the car in question.

Counsel for the State also argue that the story of Foster that they turned around in the road about a mile north of where the broken car was found, next to Hobkirk's farm, because Wehr was desirous of getting back to Springfield to work by ,eight o'clock, is most unreasonable in view of the actions of plaintiffs in error at the time and after the car was broken; that if Wehr was so desirous of getting back to Springfield to work at eight o'clock he would not have waited around the car and allowed Foster to do all the arranging about getting the broken car in but would have endeavored to get back to Springfield at once on the interurban or the Alton railroad from Williamsville; that if they were on an innocent errand, such as hunting rabbits, the broken car would have been taken at once to the garage where it was ordinarily kept, instead of leaving it in the alley across the street from Dawson's, to whom Foster had first telephoned for a relief car; that there was no reason, if they were on an innocent mission, why they should not have attempted to get relief from a garage in Williamsville. Foster testified he did attempt to get relief from a garage owner in Williamsville and was told by the garage owner that he did not have any auto fitted for that work. There is testimony tending to show that there was only one garage at the time in Williamsville, and the owner testified that no one had applied to him for any relief such as Foster testified to.

The jury heard and saw the witnesses. In cases where the evidence is conflicting, depending upon the credibility of opposing witnesses, the finding of the jury can be regarded as conclusive unless it is reasonably clear that an error has been committed. It is only where the court is able to say, from a careful consideration of the whole of the testimony, that there is clearly a reasonable and well founded doubt of the guilt of the accused that it will interfere on the ground

that the evidence does not support the verdict. (*People* v. *Grosenheider*, 266 Ill. 324, and cases cited.) The witnesses testified on all the conflicting matters before the jury, and the question as to whether or not Foster, or any of the other witnesses, told the truth was primarily one for the jury to pass upon. We cannot say that the evidence does not support the verdict.

We find no reversible error in the record, and the judgment of the circuit court will be affirmed.

*Judgment affirmed.*