(No. 11354.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CHARLES ALLEN, Plaintiff in Error.

*Opinion filed June 21, 1917.*

1. CRIMINAL LAW—*when evidence that defendant was intoxicated is admissible in prosecution for attempt to commit rape.* In a prosecution for an assault with intent to commit rape, where the prosecuting witness testifies that she detected the odor of liquor on her assailant, it is proper to admit evidence that the defendant had been drinking on the night of the assault.

2. SAME—*when an instruction as to inferring intent from declarations of the accused should not be given.* In a prosecution for an assault with intent to commit rape, an instruction stating that an intent may be inferred from the declarations of the accused as well as his acts should not be given without advising the jury that they must first believe, from the evidence, that the accused made the declarations.

WRIT OF ERROR to the Circuit Court of Lee county; the Hon. R. S. FARRAND, Judge, presiding.

W. G. KENT, and H. A. BROOKS, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, HARRY EDWARDS, State's Attorney, and ARTHUR R. ROY, for the People.

Mr. JUSTICE CRAIG delivered the opinion of the court:

Plaintiff in error was indicted, tried and convicted in the circuit court of Lee county at the January term, 1917, of the crime of assault with intent to commit rape upon Mrs. Emma Hewitt, a woman of the age of fifty-three years, a resident of Amboy, Illinois. Motions for a new trial and in arrest of judgment were overruled and the case is brought to this court by writ of error.

The defense was that of an alibi. The assault is alleged to have taken place on the night of October 12, 1916. Mrs. Hewitt testified that she left the Baptist church in Am-

boy at 8:30 that night in company with Mrs. Fowler, with whom she walked until they came to the home of the latter, from which place she proceeded alone in the direction of her own home, which was about three-quarters of a mile from the church. It had been raining and was a dark, misty night. When she was about a block from her home a man rushed at her from across the street and grasped her around the neck with his hands and choked her. She screamed and struggled, and her assailant struck her in the face, put his hand over her mouth and threw her to the ground. She struck and kicked him, and they struggled on the ground, which was wet and muddy. Her assailant made no attempt to have intercourse with her and finally got up and ran away. She got up and went on home, arriving there five minutes of nine. Her husband and son helped her into the house, called a physician and started to look for her assailant. She testified that plaintiff in error was her assailant. George H. Hewitt, her husband, testified that it was 325 feet from their house to where Mrs. Hewitt was assaulted, and that they lived about three-quarters of a mile from the church. Frank Hewitt, the son of the prosecuting witness, testified that he got home that night at twenty minutes of nine and the prosecuting witness arrived at the house at five minutes of nine; that he helped her to bed and then went down-town and informed the night marshal of the assault; that it was approximately 1800 feet from the place where the assault was committed to the railroad track; that he had run that distance in three and one-half minutes and he could walk from the business part of town to his home in ten minutes. J. H. Hughes, pastor of the Baptist church, testified that the services at the church were over that night at 8:30. John Holleran, a policeman of Amboy, testified that he saw the plaintiff in error at the depot in Amboy that night when a passenger train went north, at 8:16; that he had a blue ribbon badge pinned on his coat; that he saw him again about five minutes afterwards, in

Reinboth's saloon; that he walked from the Baptist church to the place where the assault occurred in fourteen and one-half or fifteen minutes. J. D. VanBibber, commissioner of public health and safety of the city of Dixon, testified that he was at the police station in Dixon with officer Goldsmith on the night in question and at 9:30 received a telephone message from Amboy telling of the assault and giving a description of two men; that they went to the depot, and as a freight train pulled in from the south the plaintiff in error got off the train and they arrested him; that he and officer Goldsmith took him to the jail and looked him over; that he didn't notice any mud on his clothing or scratches or bruises; that they told plaintiff in error he was wanted in Amboy; that plaintiff in error replied that he hadn't done anything out of the way; that another man named Chester Adams was on the train but remained on the train until it crossed the river and got off on the north side and was later arrested by witness on the bridge; that plaintiff in error had a badge attached to his overcoat by a small white button at the time of his arrest, blue in color, advertising a brand of beer. Otto Goldsmith, a policeman of Dixon, testified to assisting VanBibber in arresting plaintiff in error, and testified further that plaintiff in error's pants were muddy and dirty on the knees and legs. It was shown, however, from a stenographic report of his evidence taken on the preliminary hearing, and by witnesses, that he had testified at that time that he didn't notice when he made the arrest whether plaintiff in error's clothing was dirty or not. He also testified to a conversation of plaintiff in error in which he is not corroborated by VanBibber and is directly disputed by plaintiff in error and witness Hugh McKay, a railroad man who was present at the time of the arrest. The foregoing are all the witnesses and substantially all the evidence for the People.

The plaintiff in error testified that he was a cement worker, twenty-eight years old, and had been working at

the State colony at Dixon for his uncle, who was one of
the contractors, and on the date in question it was raining
and he was not working; that he started for Amboy with
two companions in the afternoon, Bert Nixon and Chester
Adams, and they arrived at Amboy at 5:30; that they went
from the railroad station to Reinboth's saloon, across the
street from the station, and from there to a near by restau-
rant, where they had supper; that they were there about
half an hour and went back to the saloon and remained
there most of the evening, drinking; that plaintiff in error,
with Nixon, returned to the station to take a passenger train
to Dixon at 8:16; that the conductor refused to let Nixon
get on the train because he was intoxicated, and plaintiff in
error took Nixon up to a box north of the depot and sat
him down there; that he was with him about ten minutes,
then went back to the saloon and was there about ten min-
utes, went back to Nixon again, then made another trip to
the saloon and left there at a quarter to nine; that he re-
turned to the depot and inquired of Earl Moran, a railroad
employee, who was there with Nixon, when he could get a
train, and was informed by Moran that one was then made
up and about to start; that he went back to the saloon for
a bottle of liquor, came back to the station and got on the
train as it started and rode on a coal car to Dixon. The
train was known as the Banana Special and was a fast fruit
train. This was the train on which he arrived at Dixon,
as appears from the testimony of VanBibber. Plaintiff in
error denied making the assault on Mrs. Hewitt, denied be-
ing in the vicinity where the assault occurred or that he
was in that part of the town or on that side of the railroad
tracks, and testified that it was the first time he was ever
in Amboy, and that he was not away from the vicinity of
the railroad station and saloon and restaurant during the
entire time he was there.

Bruno F. Reinboth testified that he conducted a saloon
in Amboy, across from the Illinois Central depot; that he

first saw plaintiff in error after the passenger train went north after eight o'clock, at which time the witness returned to work at the saloon; that plaintiff in error came to his saloon about five or ten minutes after the train went north; that he refused to sell plaintiff in error liquor; that plaintiff in error went out but came in five or ten minutes later and was again refused liquor and left the saloon. Frank Brady, a butcher and an alderman of Amboy, testified that he was in the saloon at 8:45, when plaintiff in error was there and was refused a drink, but did not positively identify plaintiff in error as the man. Earl Moran, an employee of the Illinois Central Railroad Company, testified that he was with plaintiff in error and Nixon twenty or twenty-five minutes after the passenger train went north at 8:16; that after the passenger train left he helped plaintiff in error take care of Nixon; that plaintiff in error went over in town and was gone ten or fifteen minutes and came back and talked with him; that right afterwards witness left the railroad tracks, and that was about 8:45, and the freight train was about ready to pull out. S. T. Amsbaugh testified that he first saw the plaintiff in error in Reinboth's saloon shortly after eight o'clock; that witness was in the saloon until 8:40; that plaintiff in error was in and out, and he saw him on the railing in front of the livery barn at twenty minutes to nine, when he went home; that he was in the saloon when plaintiff in error was refused liquor. Leo Farnum, clerk for the Illinois Central Railroad Company, testified that he was at the Baptist church that evening and got home between 8:30 and 8:35; that it had been raining; that the train records at the station showed that the Banana Special, the train on which plaintiff in error left Amboy, left at 8:50. Robert Calam, conductor of the train, also testified that the train left at 8:50, but the time might have varied a few minutes,—as much as five minutes either way. P. W. Mason testified that it was a little over three-quarters of a mile from the Baptist church to where Mrs. Hewitt

was attacked, and he walked the distance in seventeen minutes. William Hoover testified that he walked the same distance in seventeen minutes, walking at a moderate gait. Frank Leuer, a bar-tender in Reinboth's saloon, testified that he first saw plaintiff in error in the saloon about six o'clock, and plaintiff in error was there nearly the whole evening; that he left the saloon with Nixon and went over to the 8:16 passenger train and came back in about ten minutes; that Nixon did not come back; that plaintiff in error was in and out three or four times, and was in the saloon at 8:40, when the witness went off duty, and that he was refused drinks. Hugh McKay, a railroad man of Dixon, testified that he was present when plaintiff in error was arrested at Dixon; that he had an umbrella, and all he said was that he had done nothing wrong and wanted to know what he was arrested for.

The foregoing is the substance of all the evidence on both sides. From this evidence it appears that Mrs. Hewitt left the church at approximately 8:30 and that she arrived at the place where the assault occurred between 8:45 and 8:50. Plaintiff in error was at the Illinois Central passenger station at 8:16. He was at Reinboth's saloon ten or fifteen minutes after that, which would be between 8:26 and 8:31. He made two more trips between the saloon and the depot between that time and 8:40 and left town at 8:50. The witnesses who testified to the whereabouts of plaintiff in error were apparently truthful and disinterested and some of them hostile. Plaintiff in error was arrested shortly after leaving Amboy and was brought back the next day for his preliminary hearing, when the matter of his whereabouts was fresh in the minds of the witnesses, and we see no reason to doubt their testimony. If they testified to the truth, as we think they did, then the plaintiff in error could not have been the man who committed the assault on Mrs. Hewitt. There can be no question from the testimony of Moran, Reinboth, Amsbaugh and Leuer that

the plaintiff in error was in and out of Reinboth's saloon two or three times between 8:16 and 8:40; that he was at the train at 8:45 and left town on that train very near 8:50. The assault occurred between 8:45 and 8:50, and was probably nearer the latter minute, as Mrs. Hewitt arrived at her home, which is 325 feet distant from the place of the assault, at 8:55, and at that time plaintiff in error was on his way out of town on the freight train.

It is contended by counsel for defendant in error that the plaintiff in error could have committed the assault and by fast running reached the railroad tracks in time to catch the freight train on which he left town. According to the testimony of Frank Hewitt, one of the People's witnesses, it would be possible to run from the place where the assault was committed to the nearest point of the railroad tracks (not the railroad station) reached by streets in that time, and it would be possible to walk from the business part of town to the Hewitt house in ten minutes. The evidence, however, shows the whereabouts of plaintiff in error before the time of the assault as well as at that time, or from the time the passenger train left the station, at 8:16, to the time the freight left, at 8:50. According to the evidence he was in the immediate vicinity of the railroad station and Reinboth's saloon at 8:16, 8:30, 8:40, 8:45 and 8:50. He could not have gone from that vicinity to the place of the assault and returned to the railroad tracks in the vicinity of the station in time to catch the train which left at 8:50, or a few minutes before or after that time.

There is also some question about the identification of the plaintiff in error by Mrs. Hewitt. When plaintiff in error was brought back to Amboy for a preliminary hearing the day after the assault the husband of the prosecuting witness saw him. He was with his wife when plaintiff in error was brought into the office of the magistrate, and as he was brought in the husband of the prosecuting witness said, "He is in the room now." He admitted making this

statement but claimed that Mrs. Hewitt had recognized him before that; but if so, there was no reason for his pointing out the plaintiff in error, and for that reason the identification of plaintiff in error by the prosecuting witness is not as satisfactory as if she had picked him out from a number of others and recognized him without any assistance or beyond any question as her assailant. It was a dark night and the prosecuting witness was assaulted by a person she had never seen before. Plaintiff in error was arrested within less than an hour after the assault, and there were no marks or evidences upon his person or clothing that he had been in a struggle such as the prosecuting witness described, except as testified by officer Goldsmith, who was impeached, notwithstanding the assailant of the prosecuting witness had struggled with her on the ground in mud and water. It also appears that plaintiff in error was carrying an umbrella when he left Amboy and had it with him when he was arrested in Dixon. Mrs. Hewitt testified that when she first saw her assailant she noticed a white streak on his clothing,—like a necktie or as if his coat were open; but this does not identify plaintiff in error because of the beer badge he wore, as that was blue in color. Under the circumstances the prosecuting witness may have been mistaken in her identification of the plaintiff in error. It also appears that after the plaintiff in error was arrested he was taken before a doctor, his clothing removed and examined. It is in evidence that there were no marks, bruises or scratches showing that he had been engaged in a struggle with any person. An officer took one of his shoes and after a time returned it to him without remark. The ground at the place of the assault, as has been stated, was muddy and wet and the assailant probably left tracks. Neither the doctor who examined plaintiff in error nor the officer who took his shoe was offered as a witness. Under these circumstances, with the positive proof of an alibi, we do not think that the evidence was sufficient to justify the verdict

and judgment. As stated in *People* v. *Freeman,* 244 Ill. 590: "This court is committed to the fullest extent to the doctrine that the jury are the judges of the facts and the weight of the evidence in criminal cases. It is the duty, however, of the court to carefully review the evidence, and where a conviction is based upon unsatisfactory evidence, or where, after it has been carefully examined and considered, there remains such a grave and serious doubt of the guilt of the accused as to lead to the conclusion that the verdict of the jury is the result of passion or prejudice and not of that calm deliberation that the law requires, then it is the duty of this court to so find.—*Keller* v. *People,* 204 Ill. 604; *People* v. *Bolik,* 241 id. 394." To the same effect are *Lincoln* v. *People,* 20 Ill. 365, and *People* v. *Rischo,* 262 id. 596.

It is urged that the trial court erred in admitting evidence on behalf of the People that plaintiff in error was intoxicated when he arrived in Dixon on the evening in question. The prosecuting witness testified that she detected the odor of liquor on her assailant. For that reason we think it was proper to show that the plaintiff in error had been drinking.

The first instruction given on behalf of the People was objected to. The instruction stated as an abstract principle of law that the intent may be inferred from the words and declarations of a person charged with a crime as well as by his acts; that the intent with which his act is done is a question of fact, either to be shown by the declaration of the party or to be inferred from the character, manner and circumstances of the act. The prosecuting witness testified that her assailant said nothing,—did not speak a word during the assault. Officer Goldsmith testified to declarations by plaintiff in error when he was arrested in Dixon, but in this he was contradicted and impeached. The instruction should not have been given without advising the

jury that they must believe, from the evidence, that the plaintiff in error had made declarations.

The second refused instruction of the defendant is contradictory in its terms and misleading and the substance was given in other instructions for the defendant.

The judgment of the circuit court will be reversed and the cause remanded.     *Reversed and remanded.*