(No. 30410.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HOMER W. WILSON, Plaintiff in Error.

*Opinion filed May 20, 1948—Rehearing denied September 15, 1948.*

462

ALBERT E. ISLEY, of Newton, PARKER, BAUER & PARKER, of Effingham, and JOHN B. SWERN, of Chicago, for plaintiff in error.

GEORGE F. BARRETT, Attorney General, and J. A. EATON, State's Attorney, of Newton, (NORMA EATON, of Newton, and W. K. KIDWELL, of Mattoon, of counsel,) for the People.

Mr. JUSTICE GUNN delivered the opinion of the court:

The defendant, Homer W. Wilson, was indicted in the circuit court ·of Jasper County for the crime of murder of his wife. He was tried by a jury and found guilty, and his punishment fixed at death. He has prosecuted a writ of error to this court.

At the outset the State's Attorney contends that the report of the proceedings should not be considered by this court because it was not authenticated and filed in accordance with Supreme Court Rule 70A. The point of the State's Attorney is without merit. The trial ended on May 25, 1947. A motion for a new trial was argued June 28, 1947, and the sentence imposed upon the defendant on that date, fixing the time of his execution at September 12, 1947, which was five days after the convening of the next succeeding term of the Supreme Court, as provided by section 1 of division XIV of the Criminal Code. Ill. Rev. Stat. 1947, chap. 38, par. 749.

The provisions of Rule 70A do not apply to writs of error in capital cases, as there is a special statutory proceeding which governs in such cases. In the case of a defendant in the criminal case, who is adjudged to suffer capital punishment, he is not entitled to a writ of error as a matter of right. Section 1 of division XV of the Criminal Code, (par. 769,) provides in substance that he shall obtain a certified copy of the record from the clerk and a certificate from the judge who tried the case that such record contains a full and complete history of the proceedings, and shall present such transcript and certificate, with his assignment of errors, to the Supreme Court, if in session, or to one of the judges thereof in vacation;

and if such court or judge shall allow a writ of error, he shall endorse upon the back of the transcript an order that the same shall be a *supersedeas*. Upon the filing of such transcript and order, the clerk of the Supreme Court shall issue a *supersedeas* to stay the sentence of death until the further order of the court.

It will be noted that the statute provides that no date for execution shall be fixed sooner than the fifth day of the next succeeding term of the Supreme Court. This may be more than the 50 days allowed for writs of error in some cases as fixed in Rule 70A, as, for instance, in the present case. If the sentence had been imposed at the close of the trial on May 25, more than three months would have elapsed before the next term of the Supreme Court convened. More than that, the statute provides a writ of error in a capital case may be allowed upon and after an inspection of the certified copy of the record, duly authenticated by the judge, without fixing any time for its authentification. In the instant case the record was presented at the September term before the fifth day of the term, and the *supersedeas* authorized by the court. The objection of the People to the record in this case is without merit.

The facts in the case are very unusual. The defendant, Homer W. Wilson, was a young farmer, twenty-eight years of age, married to the deceased, LaVerne Wilson, and had one child, a little over a year old. His wife, LaVerne, suffered death in a fire on the morning of February 3, 1947. She and the defendant were married October 17, 1945, shortly after the defendant had been discharged from the army. On the afternoon of February 2, 1947, the defendant, his wife and child, visited at the home of his father, and returned home in the evening, bringing with them a considerable quantity of canned fruits and vegetables, and after these had been removed to the house, the defendant and his wife retired at about nine P.M.

His version of the tragedy is as follows: He arose the morning of February 3 around about 4:30, and started immediately performing farm work, feeding corn to his livestock, and pumping the water in a tank for their needs. His wife arose a few minutes later and around about 5:30 or 5:45 went to the barn, some distance from the house. Shortly after she went to the barn the defendant heard screams, and ran to her assistance, but was unable to get into the barn on account of the flames. He lost his outer clothing in some manner in the fire, and jumped in the water tank in his underwear. He suffered some burns himself, the fire resulting in the total destruction of the barn, which contained some grain and over 2000 bales of hay. He denies killing his wife, or any knowledge of what was the actual cause of her death. The prosecution claims this statement is wholly false, and that the defendant murdered his wife in the house, and transported her body to the barn, where he set the fire, which partially consumed the remains, after she had already been killed.

The case is entirely circumstantial. The only direct proof of the *corpus delicti* is the fact that the body was identified as that of LaVerne Wilson. Proof to establish the criminal agency, and the author of the criminal agency is wholly circumstantial. The testimony bearing upon the tragedy from other witnesses shows substantially the following: That on the morning of February 3, 1947, neighbors seeing the fire, came to the home of the defendant to render assistance. A number of them attended. It is unnecessary to go over the testimony of all of these witnesses in detail, as it is substantially the same, and not in any material respect denied by the defendant.

Millard Davis, who lived within a quarter of a mile of the place, testified there was a clear view between his place and that of the defendant, and that around 6:30 of the morning of February 3, 1947, while looking out of his kitchen window, he noticed a light near the north end

of the Wilson barn, and after watching for a minute, saw it burst into flame, with fire coming from the east and north sides of the barn, which spread very rapidly in a strong south wind. Stoie B. Maxey was the first neighbor to arrive, around about 6:30. He ran to his car with his brother and drove quickly to the fire; they were there within five minutes, but when they arrived the barn was aflame, and they saw the defendant as they drove in, who had no clothes on but his underwear, and in answer to a question as to what had happened said: "I don't know, but Sis [his wife] is in the barn." They tried to get in the barn, but the flames were so strong they could not enter. One of the Maxeys took the defendant into the house. It was dark, and there was no lamp burning, and the baby was still lying in bed asleep. The defendant removed his underwear, and laid same across the bed. There was evidence they had been burned, and were wet. Salve was rubbed on the burns of the defendant, which were on the upper edges of both ears, back of the left hand, side of the left leg, and back part of the left foot. When asked why his wife was going to the barn he replied he did not know, unless she was going after eggs.

A number of the neighbors testified to substantially the same facts. The defendant was shortly after that taken in an ambulance to the hospital. The other neighbors finding they could not put out the fire threw water on the chicken house, so that it would not burn, the water being obtained from a barnlot well, at which there was a stock tank that had ice on the bottom about an inch thick. No part of the clothing of the defendant was found, except one boot, which was not identified, nor admitted by the defendant to be his.

During the course of the morning the fire department from Oblong came to the scene of the fire. By that time the building and contents had been practically consumed, and they proceeded to take steps to recover the body. The

embers were too hot to probe, so means were devised of getting a road drag and pulling it through the embers and ashes to get the body out. This drag weighed some three or four hundred pounds, and had blades which could be adjusted by a lever, for the purpose of smoothing or scraping earth upon the public roads. It was made of iron or steel. A long chain was attached to it, and by a tractor it was dragged through the smoldering fire. After a few drags they pulled out the remains of a calf, and also pieces of a lantern, and finally from near the northwest corner of the barn the body of the deceased was dragged out. It is uncertain whether the drag had been over this part of the premises, but most of the witnesses claim it had not been. The body was badly mutilated and burned; the lower parts of both arms were missing, and the top of the cranium or skull cap was off, exposing the brain. A portion of skull bone was found in the ashes after the embers had cooled. Also, there was a large gaping wound in the throat exposing the spinal vertebrae, and there were several other lacerations on the body. The body of the calf was torn up and badly mutilated.

The doctor who conducted the autopsy gave it as his opinion that the deceased had not died from the fire, but from wounds produced before the fire. He was also of the opinion that none of the wounds or mutilation were caused by the road grader while dragging the body from the ashes, and that these wounds were the cause of death. One of the doctors for the defense testified that in his opinion the wounds on the body, and the loss of the arms and the top part of the skull was caused by the road grader going over the body. The two doctors who first examined the body, after it was recovered, admitted the mutilation could have been caused by the grader. The condition of the wound in the throat and the part of the skull removed indicated these might have been fresh wounds, as there

was no evidence of scorching or burning at the ends of the bones protruding from the wounds. There were no knives, hatchets, or other sharp-edged tools found in the debris of the barn, nor around the house. A claw bar was found, which is an instrument for pulling nails or staples, about 18 to 20 inches long, and three-fourths of an inch in diameter, with a loop-back curve at one end. After the fire had completely burned out some small bones and the heel of a shoe, and a few other like articles were found.

A matter upon which particular stress was placed by the State was that on or around the neck of the deceased was what one doctor described as what appeared to be coarse twine or small rope. The facts show that part of the hay was baled with twine and part with wire, and the grader being dragged through the ashes and debris pulled out wire and part of the twine or rope used in baling the hay. Two of the doctors for the State describe this mass on the throat as capable of being raised or loosened by forceps, and as from four to six inches long. Different inferences can be drawn from this description, one resulting naturally from a body being dragged through debris; another with a criminal significance.

The evidence also discloses there was a path running from the house through a yard gate to the barn, and that along the side of the path were spots of blood, some of which proved to be human blood; and some spots upon posts. There was some evidence of blood spots on the sidewalk and porch but the witnesses on the point were not positive and in most instances admitted they might be mistaken, but stains, claimed to be blood, were found in a wash basin. There is some evidence a calf had cut its leg on a wire fence, and had walked along the place where the drops of blood were found on the ground near the fence. It is also to be considered none of these blood spots were noticed on the morning of the fire, but were

noticed from one to three days later, after many people had been in and around the house, so that such proof is subject to the possibility of having occurred after the fire had been extinguished. No evidence of any struggle having taken place in the house was discovered, and, as pointed out above, the baby was found sleeping in its bed.

The defendant went upon the stand and denied *in toto* that he had committed the crime. He was exhaustively cross-examined on events from his earliest youth to his experience in the army, his courtship and marriage, and matters which might disclose a motive for the killing, and apparently was a truthful witness in most respects, there being some disagreement concerning events occurring in and around the fire, some of which are debatable, because they depend upon conclusions drawn from circumstances of a hypothetical nature.

The evidence shows there had been some domestic trouble between the defendant and the deceased, which some months before had resulted in her leaving him, and he taking the baby to his mother's home. This trouble apparently was adjusted, because the parties again went back to living together. The State indicates he did not furnish his wife with a great deal of money for clothing and food, but does not prove this was from a wilful or penurious disposition, or from lack of inclination to furnish more money. These circumstances are all urged by the State as tending to furnish a motive.

While counsel for both plaintiff and defendant go into minute details as to the facts surrounding the death of this woman, two opposite conclusions are reached. The State claims that the defendant murdered his wife in the house, by some instrument unknown; carried her body from the house to the barn, placed it inside, and set the place on fire. As claiming to support this theory proof is made that, some three or four months before, insurance was taken out on the barn and its contents, including

machinery, which would protect the defendant in case of loss. On his part the defendant claims there is no proof of motive; no proof of any actual violence upon his part; that the most that is established are suspicious circumstances; that the whole case is entirely circumstantial, and urges if there is any other hypothesis upon which the deceased could have met her death it is the duty of the court, and the jury, to acquit him.

Weighing the probabilities they may be summed up against defendant as follows: (1) There was blood along a path leading from the yard gate to the barn; (2) the testimony of Dr. Appel indicates the cause of death was wounds and not suffocation, or from the results of a fire; (3) the disappearance of all of the clothing except the underclothes of the defendant; (4) the fact there had been in the past some family disagreement between the defendant and the deceased; (5) that he had covered the contents of the barn and the barn itself with insurance some months prior to the fire; and (6) no apparent cause for suicide upon the part of the deceased, or the presence of any other person who could have committed the crime.

On the other hand the defendant claims his total denial of the commission of the crime is supported by probabilities arising from the following facts: (a) A reasonable doubt as to the cause of death, as to whether it was through accident or by a criminal agency; (b) the fact that the lantern was found in the ashes of the barn; (c) the testimony of Dr. Orlando F. Scott, who drew the conclusion from the testimony of the doctor performing the autopsy, that the death might even yet have been caused by suffocation and fire; (d) the possibility, or even probability, that the wounds found upon the body, the loss of the arms, and the wound in the throat and loss of skull cap could have been caused by the heavy iron drag which was used to pull the body from the debris, after it had been exposed and softened by the fire for several hours; (e) the fact

that the calf killed in the same fire was found to be badly mutilated by the machine; (f) the fact that the defendant undoubtedly received burns, probably destroying his outer clothing, as bearing upon his efforts to assist his wife; (g) the proof of good character; and (h) the lack of convincing proof of a motive for murder.

From all of these facts the State deduces the defendant murdered LaVerne Wilson in his home. The motive urged is not specific, but it is claimed that it might be hatred, stinginess, or fear. These do not seem to be consistent, because the only fear argued is that she might leave him, and certainly hatred and stinginess would have a tendency to cause this very result. As a matter of fact, there is nothing in the evidence which could be seriously urged as a motive for murder in a person of no greater subtlety than appears to be possessed by the defendant.

The principal argument for this position of the People is in the claim that the defendant had lied, and his story was inconsistent. It is contended that his testimony shows he faced in the wrong direction while pumping water in the tank, and that he spent more time in filling the tank than ordinarily should have been taken; and it is not established that he shoveled ten bushels of corn into his truck; and a number of other circumstances claimed to be inconsistent with what other people would have done at the same time, and under the same conditions. There is no proof in the record as to what would be the proper position while pumping an iron pump, or what would be a reasonable time for pumping a tank of water, or as to whether any, or how much, corn was shovelled into the truck, which had been consumed by fire. To our mind these are all speculations, which had little to do with proving the statements of the defendant were untrue or inconsistent. It is claimed procuring insurance is a suspicious circumstance, but it is also recognized as sound business to protect a harvest after it is put under cover.

It is also urged that some things which were later proved to have happened, at the trial, were not mentioned at the time by the defendant, and in this we see no great inconsistency, because the proof shows that he had been rather severely burned, and was shortly afterwards taken to a hospital for treatment. The fact remains that the State undertook to prove the defendant had murdered his wife in the house, and then carried her body to the barn. As a part of this proof it undertook to show that the statements of defendant were untrue, and yet, closely analyzed, the testimony of the defendant neither adds to nor detracts from the fact that the evidence from which a murder inside of the house could have been deduced consisted of some spots of blood leading up to the garden gate from the direction of the barn. The deceased was a young, healthy woman, and it seems incredible that a bloody murder of the kind assumed by the State could occur without leaving any trace of a struggle, or the result of such a struggle, inside of the house. The wounds which the State contends were inflicted were such as would in all probability have emptied the body of blood, and the struggle would undoubtedly have overturned furniture and spattered evidence on the floor, walls and ceilings, which would have been impossible to eradicate. Reasoning of a similar character resulted in the discharge of the defendant in the case of *Mooney* v. *People,* 111 Ill. 388.

In this case, in the first two counts the indictment charged the defendant with killing his wife by strangulation; in the third count by means of some blunt instrument; in the fourth count by means of some sharp instrument; and in the fifth and sixth counts by means of mutilation, in some manner unknown. The trial court took from the jury the first two counts, so that the question of death by strangulation is eliminated. There is no evidence whatever as to the manner of causing death, except by inference.

As pointed out above, the cuts and mutilation of the body could well have been inflicted by the road drag, as was that of the body of the calf taken from the same ruins. If the wounds upon the body of the deceased were inflicted by the drag there is no proof of a wound inflicted by the defendant. Death by suffocation or fire is not to our mind entirely eliminated. The testimony of Dr. Scott throws some doubt upon the accuracy of the autopsy, and the absence of soot or ashes in the lungs may have been prevented by the deceased putting the leather jacket she wore over her head, or before her face, while calling for help, or trying to escape. The fact the top portion of the skull was found in the ruins after the fire, with the serrated edges corresponding to the sutures found in the cranium, would also tend to indicate it had been removed by the drag after the softening processes of the fire, rather than by the blow of a blunt instrument, and is also contrary to the theory the wounds were inflicted in the house.

The lantern used by the defendant was left hanging on a beam in the barn, and the possibility exists of its being dropped by the deceased as she went into the barn, or of its being brought in contact with the hay, which was piled clear to the floor in parts of the building, thus causing the fire. There is ground for an inference that the fire was accidental, and hence the death of the deceased might have also been accidental. In cases where the proof is entirely circumstantial, if there is any reasonable hypothesis arising from the evidence, consistent with the innocence of the defendant, it must be adopted. It is essential to a conviction upon circumstantial evidence that the facts proved be not only consistent with the defendant's guilt, but that they be inconsistent, upon any reasonable hypothesis, with his innocence. *People* v. *Holtz,* 294 Ill. 143.

As illustrative of the caution with which this court has approached the question where the evidence is entirely

circumstantial, *Mooney* v. *People,* 111 Ill. 388, presents a good example. In that case two prisoners were confined in the same cell. A guard on the outside heard an outcry. When he rushed down to the place, the defendant was in an upper berth and the deceased was upon his hands and knees on the floor of the cell, and was later found to have suffered some twenty-five or thirty cuts. The defense was they were self-inflicted. There were no eyewitnesses. In reversing the case and discharging the prisoner, the court found that the cuts could have all been self-inflicted, and the fact that the defendant had no blood stains or bruises upon him rendered the case so doubtful and mysterious that he should be discharged. Commenting upon the evidence Mr. Justice Mulkey, in a separate opinion, said: "A conviction is asked in the case upon circumstantial evidence alone. The unquestioned rule in such case is, that before conviction can properly be had, the guilt of the accused must be so thoroughly established as to exclude every other reasonable hypothesis. This has not been done. The whole case seems shrouded in mystery and doubt to such a degree that it would be dangerous to permit the conviction, and it should therefore be reversed."

In the case of *People* v. *Campagna,* 240 Ill. 378, the deceased and the defendant were very close friends. The deceased was employed to attend lamps of a railroad company, and had his oil supply in a car located on the premises. One day the car burned, the door was locked, and the deceased was found dead in the car. After his death the defendant succeeded to his job. It was claimed the defendant was seen in the vicinity of the car. The evidence in this respect was doubtful. The case seemed to center upon the time the defendant was seen about the railroad near the car. This evidence was highly contradictory. The court quoted the rule that every reasonable hypothesis must be indulged in favor of the accused, and then commented: "The evidence for the State, standing

alone, does little more than excite a suspicion of guilt. With all the evidence for the prosecution considered, it is not of that convincing character that satisfies the mind. On this record there must be a reasonable doubt of the guilt of the plaintiff in error. While this court is fully committed to the doctrine 'that the jury in their deliberation are the judges of the facts and the weight of the evidence in all criminal cases,' yet this court should not hesitate to reverse a judgment of conviction in a criminal case where the evidence on which it is based is of such an unsatisfactory character as it is here."

In *People* v. *Ahrling*, 279 Ill. 70, the defendant was accused of murdering his wife by burning the house in which she was found, or killing her and burning the house afterwards. The evidence was entirely circumstantial and required that the jury and the court disbelieve two witnesses, consisting of his brother-in-law and wife. In commenting upon the evidence the court said: "We think it is shown beyond question, from the evidence in the record, that the remains found in the ruins of plaintiff in error's home were the remains of his wife, but we do not think there is any satisfactory evidence to show the criminal agency of plaintiff in error in connection with her death. This fire and death occurred in the winter season, and it must be reasonably presumed that a considerable fire was required to keep the building warm, it being heated by a stove or stoves. That buildings of that character are liable to catch fire is a fact too well known to require any argument to sustain such conclusion. It is a maxim of our law that where an act may be attributed to a criminal or to an innocent cause it will be attributed to the innocent cause rather than to the criminal one. A crime is never presumed where the conditions may be explained upon an innocent hypothesis. * * * It cannot be determined on this record that there was any criminal agency exercised by anyone in connection with her death, much less

is there any evidence in the record to sustain the theory of the State in their belief that the plaintiff in error killed his wife by violent means, placed her body under the floor, and on Monday morning, after having set fire to the building, went over to the Haag home." The court then discusses the State's theory that the brother-in-law and his wife were interested and unreliable, and for this reason their testimony should be disregarded, but concludes that without their impeachment they were not at liberty to disregard the testimony entirely, and because of the unsatisfactory character of the proof the cause was remanded. In that case the court also said that, because of the fact that other proof might be produced upon another trial, some of the additional errors in the case should be discussed. That situation exists here. We are not prepared to say that additional evidence may not be produced upon another trial, and hence for that reason will discuss some other errors which occurred during the trial.

In the instant case the trial lasted thirteen days, including four days in the selection of a jury. At the conclusion of each day the jury was allowed to separate. Upon the jury were ten men and two women. Apparently there was no hotel capable of housing the entire jury, nor a suitable place in the court house. Accordingly the two women jurors accompanied by a female bailiff stayed during the evenings at a residence in the town of Newton. The remainder of the jury, consisting of the ten men, was divided into three groups, each with a bailiff, and slept overnight in a tourist home. During the evenings they sometimes rode around in separate groups by automobile, and some walked, but during such times the bailiffs were present. They took their meals in a public place within the hearing of other patrons of the restaurant. The courtroom was small, seating about 300 people, but fully 500 people attended each day. The county seat was a town of about 2000 inhabitants, and the trial was apparently the

chief event of interest during its entire course. There are affidavits from both sides: By the defendant that the jury could have been influenced, and by the State that it could not have been influenced by outside means. Apparently there was a tremendous interest in the result of the trial.

Under the common law the rule undoubtedly required that the jury be kept together without meat or drink until a verdict was reached. (3 Blackstone, 375.) The rule requires jury trials in this State to be in accordance with the course of the common law. (*Research Hospital* v. *Continental Illinois Bank and Trust Co.* 352 Ill. 510.) There has been some amelioration of the old practice in the course of the years, and to a large extent the question of whether or not the jury should be kept together and not allowed to separate depends upon the sound discretion of the court. It has been said that the job of keeping the jurors together is not so much to aid them in reaching a verdict as to prevent them from being influenced by outside sources. Strong language has been used in capital cases that a jury should not be permitted to be separated at all. (*Jumpertz* v. *People,* 21 Ill. 375; *People* v. *Schneider,* 362 Ill. 478; *People* v. *Strause,* 290 Ill. 259.) Other decisions have tended to abate this practice to a certain extent, holding in substance that it is not error, unless prejudice can be shown. (*People* v. *Fisher,* 340 Ill. 216; *People* v. *Casino,* 295 Ill. 204.) We think the *Casino case* is a fair summing up of the rule, *viz.,*—that where separation of the jury is the *only error* relied upon there must be a showing of prejudice, but where other errors intervened such misconduct would have weight on the question of granting a new trial.

A defendant on trial for his life is entitled to the requirement of the law that he have a fair trial. The circuit judge in denying a new trial said he did not believe there was any prejudice in the fact that women were put in one

place and the men in another. To the extent that the jury was separated into four groups merely for housing purposes, we agree with the trial judge, but in a case where interest in the result is apparent to the extent that at times it was manifested by the action of the spectators in the court room and by the crowds of people assembled in the town, we do not believe it is fair to the defendant to have the jury placed in such contact with the public that the jurors could either hear or feel the public attitude, and certainly the crowded restaurant where for thirteen days they had their meals gave ample opportunity for them to be influenced consciously or unconsciously by the feeling or bias of the attending public. While we have laid down no strict rule, in view of the closeness of the evidence in the case, we believe the ends of justice would have been better served had the jury been so domiciled and fed as to be removed from the influence of the public.

It also appears in this case that some evidence highly prejudicial to the defendant crept into the case. Alberta Pictor, who was related to the family of the deceased, was asked generally to give a conversation relative to defendant's demeanor and attitude for the most part, and her reply was that he had said: "When any body wants me to do anything, I generally do just the opposite." And also, "When I was in the Army I offered one of my companions $500.00 to shoot me in the foot so I wouldn't have to go up front." This, of course, was not responsive, and highly objectionable, and was stricken upon the motion of counsel for defendant, and the jury instructed to disregard it. The question remains, however, whether it is possible for the jury to have the sting of such a remark taken from their minds. It does not appear that the State's Attorney disclaimed this remark.

During the cross-examination of the defendant the assistant State's Attorney started to put to him the question produced by the first answer of Alberta Pictor, although

he knew the court had stricken the statement during the course of the proof of the People. He then continued this line of cross-examination by saying: "You took an oath to defend your Country, the Country in which you live?" Objection to this was sustained, and thereupon he asked the question: "Now isn't it a fact you were AWOL, while you were in the Army?" Objection was sustained to this question, whereupon the assistant State's Attorney said he would like to be heard, and said: "They made an issue of a good reputation in the Army." Objection to this was sustained by the court. It requires no citation of authority to hold this was highly improper, and doubtless highly prejudicial in a case where the evidence is of a very doubtful character.

The law is clear that particular acts of misconduct are not admissible in rebuttal of proof of defendant's good character. (*McCarty* v. *People,* 51 Ill. 231; *Addison* v. *People,* 193 Ill. 405.) Notwithstanding the court sustained the objection, the fact remains that his reputation as a good citizen was questioned by insinuations in the presence of the jury, through improper questions of the assistant State's Attorney. In *People* v. *Lewis,* 313 Ill. 312, a similar question arose. We there said: "Many questions asked plaintiffs in error and their witnesses on cross-examination had no tendency to prove their guilt of the crime charged, but the only tendency was to prejudice plaintiffs in error with the jury and influence them to return a verdict of guilty on general principles. The State must have known it was not competent to ask plaintiffs in error or witnesses if they had not been indicted for other crimes, or the many other questions, * * * which had no tendency to prove the issue being tried. The only effect of such an examination would be to cause the jury to believe plaintiffs in error were bad men and likely to commit such a crime as the indictment charged."

In *People* v. *Newman,* 261 Ill. 11, the court said: "The

plaintiff in error had a right to a trial by jury on competent evidence and to have his witness appear without any illegal disparagement of his credibility. The question is not what, with the aspersions against the witness wrongfully appearing in the record, we may think of the guilt or innocence of the plaintiff in error, but what would the jury have done if the case had been submitted to them without those aspersions."

It was serious error in the case to bring out the answer of Alberta Pictor, which was obviously known to the State's Attorney, or to cross-examine plaintiff in error upon the theory that he had been an offender of military regulations. A fundamental concept of the law is that a man accused of crime shall, above all, have a fair trial. As an element of such a trial the evidence must prove his guilt beyond a reasonable doubt. If the evidence is wholly circumstantial it possibly may prove his guilt beyond a reasonable doubt, but it must be closely scrutinized, and if, when fairly considered, it presents another hypothesis consistent with innocence, the latter must be adopted in preference to guilt.

The elements of murder which must be established are: The proof of death and the proof of a criminal agency causing death. Both of these elements must be established by evidence beyond a reasonable doubt. After these elements, termed in law the *corpus delicti,* have been proved, then the law requires that the evidence establish beyond a reasonable doubt that the defendant was the criminal agency, or put in motion the criminal agency, which caused the death of the victim. In addition to the foregoing, the jury which determines these essential elements must be fair, unbiased and free from outside influence when it makes its decision, and must also receive proper and legal directions or instructions from the presiding judge as to the law governing the particular case under consideration.

In the present case the proof is lacking to a moral certainty on more than one essential element to prove the

crime of murder. The cause of death is in doubt; the manner of death is in doubt; and the place where death occurred is in doubt; and necessarily with these doubts there must be a doubt that murder was in fact committed. It is not for the defendant to establish his innocence, but for the State to establish his guilt. This guilt must be established by legal and competent evidence, uninfluenced by bias or prejudice raised by irrelevant evidence, or by unjustified aspersions or insinuations tending to inflame the minds of the jury.

Analyzed closely, the theory of the State is based upon circumstances which do not necessarily produce the result claimed. In the *Jumpertz case* Mr. Justice Breese, dissenting, remarked, "There is in every mind, a strong tendency to weave for itself a theory out of the minute incidents surrounding a transaction, itself shrouded in some mystery, and to bend everything to its support." In the instant case the absence of many essential elements of proof depending upon inference from other supposed facts, not fully proved, together with the errors pointed out herein, have caused us to have a reasonable doubt that the defendant has been proved guilty by evidence, and in the manner provided by law. A new trial may supply additional proof, and certainly will eliminate the errors of law committed during the trial.

Other points are urged and argued by plaintiff in error which have some merit, but as they will probably not recur upon another trial, they are therefore not discussed. We think, under all of the circumstances of the case, the plaintiff in error is entitled to a new trial.

The judgment of the circuit court of Jasper County is accordingly reversed and the cause remanded.

*Reversed and remanded.*