**UNITED STATES of America ex rel. Henry WINTERS, Petitioner,**

**v.**

**Larry MIZELL, Respondent.**

**No. 86 C 1385.**

United States District Court, N.D. Illinois, E.D.

Sept. 22, 1986.

---

784

Mindy S. Trossman, James A. Klenk, James R. Daley, Isham Lincoln & Beale, Chicago, Ill., for petitioner.

Joan Fickinger, Asst. Atty. Gen., Chicago, Ill., for respondent.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Henry Winters ("Winters") has filed a Verified Amended Petition ("Petition II")[1] for a writ of habeas corpus under 28 U.S.C. § 2254 ("Section 2254") against Warden Larry Mizell ("Mizell") of the Shawnee Correctional Center ("Shawnee") in Vienna, Illinois.[2] Now both sides have filed cross motions for summary judgment under Fed. R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, this Court finds no evidentiary hearing is required and dismisses Petition II on the merits.

### Procedural Background

At midnight September 4, 1976 Winters and John Fogli ("Fogli") went to an abandoned warehouse in Chicago to work their joint midnight-to-noon shift as security guards, relieving Ronald Steiner ("Steiner") and another guard. When Steiner returned to the warehouse the next day at noon to begin his shift, Winters was no longer there and Fogli lay dead from bullet wounds.

Following a jury trial in 1978 Winters was convicted of murdering Fogli and sentenced to 40 to 60 years in prison. His conviction was affirmed on appeal, *People v. Winters*, 97 Ill.App.3d 288, 52 Ill.Dec. 763, 422 N.E.2d 972 (1st Dist.1981) ("*Win-*

---

**1.** Winters filed his original petition in this action pro se on February 10, 1986 and moved for appointment of counsel. This Court appointed James A. Klenk and James R. Daley, who had also represented Winters as apointed counsel when he filed an earlier Section 2254 petition ("Petition I") in this District Court in 1982 (see "Background"). Messrs. Klenk and Daley and Mindy S. Trossman (all of the law firm of Reuben & Proctor, now a part of Isham Lincoln & Beale) filed Petition II April 7, 1986. Ms. Trossman was responsible for the excellent (though ultimately unsuccessful) brief filed on Winters'

behalf. That effort was matched by the first-rate submissions filed on respondent's behalf by Assistant Attorney General Joan Fickinger.

**2.** Because Winters was incarcerated in the Stateville Correctional Center in Joliet, Illinois when the Amended Petition was filed, Stateville Warden Michael O'Leary was then named respondent. Later Winters was moved to Shawnee, and the pleadings were amended to name Mizell instead.

*ters I* "). Although the Appellate Court held five objects introduced into evidence should have been excluded for lack of adequate chain-of-custody testimony, it concluded a new trial was not required because there was other "convincing and overwhelming" evidence upon which to convict Winters (*id.* at 296, 52 Ill.Dec. at 771, 422 N.E.2d at 978). Leave to appeal to the Illinois Supreme Court was denied, and the United States Supreme Court denied certiorari, 455 U.S. 923, 102 S.Ct. 1282, 71 L.Ed.2d 464 (1982).[3]

Winters then filed Petition I here. This Court's *Petition I* opinion dismissed that action without prejudice, to allow Winters to exhaust available state court remedies.[4]

Winters then proceeded toward that end, filing a pro se petition for a post-conviction hearing under the Illinois Post-Conviction Hearing Act, Ill.Rev.Stat. ch. 38, ¶¶ 122–1 to 122–7 (the "Post-Conviction Act") on the grounds:

1. the evidence was insufficient to prove him guilty beyond a reasonable doubt;

2. the prosecutors made prejudicial and inflammatory remarks during opening and closing arguments; and

3. he was denied effective assistance of counsel at trial and on appeal.

That petition was dismissed summarily at the Circuit Court level. No counsel was appointed, and the court held (*People v. Winters*, No. PC 4015, unpub. order at 2–3 (Cir. Ct. Cook County April 16, 1984) (emphasis in original)):

> The record of proceedings discloses no evidence whatsoever of actual incompetence of trial counsel. The allegations concerning prosecutorial misconduct in the context of the 6th Amendment claim pales [sic] to insignificance considering the record and the fact that this was a bench, *not a jury*, trial.[5]
>
> The failure of appellate counsel to raise insufficiency of evidence, prosecutorial misconduct and ineffective assistance of counsel, in the light of the overwhelming evidence in this case, the vigorousness of defense counsel at trial and the fact that this was a bench not a jury trial is [sic] patently insufficient to state a claim under ch. 38 § 122–2.

Winters' next stop was the Illinois Appellate Court, where he chose not to challenge the insufficiency of the evidence or prejudicial prosecutorial comments during the opening statement. Instead he raised only

---

**3.** This Court's opinion in the Petition I case, *United States ex rel. Winters v. DeRobertis*, 568 F.Supp. 1484, 1485–86 (N.D.Ill.1983) ("*Petition I*") summarized the grounds for reversal raised in Winters' pro se brief to the Appellate Court as well as in the appeals to the Illinois and United States Supreme Court.

**4.** Petition I had asserted only three of the five claims raised in Petition II: Winters did not originally raise (1) ineffective assistance of counsel or (2) misapplication of the harmless error rule. While this Court concluded Winters had exhausted state remedies as to all three grounds raised in Petition I, it found he had waived his Fifth Amendment claim, and possibly his prosecutorial misconduct claim, by failing to raise them on direct appeal (*Petition I*, 568 F.Supp. at 1487–88). That then posed the question whether the "cause and actual prejudice" standard of *Wainwright v. Sykes*, 433 U.S. 72, 90–91, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977) was met, to permit those claims to be considered despite the procedural bar of waiver. Winters argued the ineffectiveness of appellate counsel, itself an unexhausted and independent

habeas ground, was the "cause" of his failure to raise those claims on direct appeal. Rather than conducting a hearing into the incompetence of counsel and deciding that issue in the first instance, this Court chose the dismissal route to avoid indirect subversion of the comity considerations identified in *Rose v. Lundy*, 455 U.S. 509, 518–19 (1982), which underlie the exhaustion doctrine. It is now clear this is the required approach, *Murray v. Carrier*, — U.S. —, 106 S.Ct. 2639, 2646, 91 L.Ed.2d 397 (1986):

> [E]xhaustion doctrine …generally requires that a claim of ineffective assistance [of counsel] be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.

**5.** [Footnote by this Court] In fact the trial was before a jury. That error was noted by the Appellate Court (*People v. Winters*, 132 Ill. App.3d 1162, 98 Ill.Dec. 837, 494 N.E.2d 959 (1st Dist.1985) ("*Winters II*")) in its review of the Circuit Court order, but *Winters II* concluded the mistake did not have "any effect on the outcome in light of the conclusion we reach."

two grounds for reversal: (1) prejudicial comments by the prosecution during the closing statement at trial and (2) appellate counsel's incompetence for not challenging those comments on direct appeal.[6] In affirming the Circuit Court, *Winters II*, 132 Ill.App.3d 1162, 98 Ill.Dec. 837, 494 N.E.2d 959 held (1) the Fifth-Amendment-related claim had been waived by not raising it in a post-trial motion and (2) appellate counsel had in fact been competent.[7] Winters' petition for leave to appeal to the Illinois Supreme Court was denied. At last Petition II followed.

### Evidence at Trial

At midnight on September 4, 1976 Winters and Fogli, both security guards for Burns International Security Services, Inc. ("Burns"), went to an abandoned warehouse in Chicago where they were assigned the midnight-to-noon guard shift (R. 119–20). Steiner, one of the two guards they were replacing, told Fogli a gun and bullets had been left in a desk drawer at the guard station (R. 128). Winters was sitting at the desk, three feet away from Steiner, entering his name on a logbook, when the gun was mentioned (R. 129–30).

Next day at noon Steiner returned to the warehouse to begin his shift and noticed no cars were parked by the loading dock, even the 1967 Pontiac (Fogli's car) that had been parked there when Steiner left the building the day before (R. 138, 140–41). When Steiner knocked on the warehouse door to be let in no one responded, so he telephoned his supervisor, John Schulz ("Schulz") (R. 142–43, 225). Schulz and

another supervisor, Captain Elias ("Elias"), came and broke into the warehouse (R. 147–48, 150, 227–30). They discovered Fogli's dead body (R. 151, 232) and an empty desk drawer—no longer containing a gun or bullets (R. 229).

Examination of Fogli's body revealed he had sustained gunshot wounds to the head and chest (R. 392–93). Although the bullet taken from Fogli's body was too mutilated for comparison purposes, a firearms expert concluded it had characteristics consistent with characteristics of the gun that had been in the desk drawer, as did a second bullet found near the body. In addition, a third bullet also found near the body was identified as definitely having been fired from that gun (R. 543–44).

Police investigation also revealed the doors to the warehouse were still sealed from the inside (closed, locked and boarded) and had not been disturbed (R. 322–23, 333–34). There were some broken windows, but they were too small for someone to climb through (R. 338).

At about 1:20 p.m. September 5, 1976 (just about when Fogli's body had been found and the investigation begun) Edward Funchess ("Funchess"), manager of the Alex Theatre, saw Winters pointing a gun at a man seated in a taxicab near the theatre (R. 251–52) and then at two men walking down the street (R. 253). Winters was still wearing his security guard uniform and his shirt was stained with blood, which turned out to be consistent with a

---

6. This description of the issues was provided in *Winters II*, 132 Ill.App.3d 1162, 98 Ill.Dec. 837, 494 N.E.2d 959. Presumably the assertedly prejudicial comments were challenged on Self-incrimination Clause grounds, because the court examined two statements about "unrebutted" evidence (*id.* 132 Ill.App.3d 1162, 98 Ill.Dec. 837, 494 N.E.2d 959) and concluded they were not impermissible comments on Winters' failure to testify (*id.*, 132 Ill.App.3d 1162, 98 Ill.Dec. 837, 494 N.E.2d 959), although the court never referred specifically to a "Fifth Amendment" claim (or, more accurately, to the Fourteenth Amendment or to the Illinois counterpart of the

Self-incrimination Clause, Ill. Const. art. I, § 10).

7. Because the post-trial motion did not challenge the two comments about "unrebutted" evidence, the Appellate Court found Winters' appellate counsel could not have raised that waived issue on direct appeal unless it was "plain error" under Supreme Court Rule 615(a), Ill.Rev.Stat. ch. 110A, ¶ 615(a). And because the claim itself was considered "without merit," *Winters II*, 132 Ill.App.3d 1162, 98 Ill.Dec. 837, 494 N.E.2d 959 held appellate counsel's failure to raise it on direct appeal was not "patently wrong," so the claim was waived.

sample of blood taken from Fogli's body (R. 466–67).* [8]

Funchess watched as Winters entered the theatre with the gun pointed at the backs of the two men (R. 255–57). After searching them, Winters saw Funchess and pointed the gun at him (R. 258). Finally, as Winters was trying to leave the theatre, Funchess and another theatre manager wrestled him to the floor and took the gun away (R. 259). Funchess noted there was a wooden peg * in the gun (R. 261). Steiner was later able to identify the gun as the same one left in the desk drawer at the warehouse because the serial numbers were the same and the gun in the drawer also had contained a wooden peg (R. 134–36, 217–18).

After the disturbance at the Alex Theatre, Winters was taken to a police station. In the interview room he emptied his pockets, removing a key case *, keys * and a tube of lipstick (R. 351). Winters twice knocked the keys off the table in the police station interview room, and a police officer returned them to him (R. 353–54, 356). Later, as Winters walked toward the lock-up, he again dropped the keys. This time they were not returned to him (R. 357–58). They turned out to be the keys for Fogli's car, which was found near the Alex Theatre (R. 295–96).

Winters never testified at his trial. Defense counsel called only one witness, a toxicologist, who testified about the blood sample taken from Fogli's body (R. 680–81).

### Winters' Theories

Winters raises five grounds for habeas relief:

1. During Winters' murder trial prosecutors commented on his failure to testi-

fy in violation of the Fifth Amendment ("Fifth Amendment claim").[9]

2. Various forms of prosecutorial misconduct made the trial so unfair as to violate Winters' right to due process under the Fourteenth Amendment ("prosecutorial-misconduct claim").

3. Appellate counsel failed to raise the prosecutorial-misconduct and Fifth Amendment claims on direct appeal, thus denying Winters his Sixth Amendment right to effective assistance of counsel ("ineffectiveness-of-counsel claim").

4. *Winters I* erroneously found improperly admitted evidence at the trial harmless error, depriving Winters of his constitutional right to a fair and impartial trial ("misapplication-of-the-harmless-error-rule claim"); and

5. Absent the excluded evidence, there was insufficient evidence to have led a rational trier of fact to find guilt beyond a reasonable doubt as required by the Fourteenth Amendment ("insufficiency-of-the-evidence claim").

Those grounds are not, either singly or collectively, sufficient to withstand dismissal.

### Exhaustion of State Remedies

■ Winters asserts (Petition II ¶ 18), and Mizell does not dispute (Answer to Petition II ¶ 11), his exhaustion of state remedies. Even so, if there *are* unexhausted claims this Court may raise the issue sua sponte and dismiss the action. *Granberry v. Mizell*, 780 F.2d 14, 15–16 (7th Cir.1985).[10] When this Court examined Petition I it concluded three claims (Fifth Amendment, prosecutorial misconduct and insufficiency of the evidence) had been exhausted. *Petition I*, 568 F.Supp. at 1487. Consequently, only the two new claims (in-

---

**8.** Each asterisk in this factual recital indicates the Appellate Court in *Winters I* later found the evidence (here the sample of blood from Fogli's body) inadmissible because of an inadequate evidentiary foundation—incomplete chain-of-custody testimony.

**9.** As always this Court follows the convenient (albeit imprecise) practice of referring to underlying Bill of Rights provisions, rather than to

the Fourteenth Amendment (which applies those provisions to state action).

**10.** It remains uncertain in this Circuit whether a District Court *must* raise the issue sua sponte and dismiss, or whether exhaustion may be waived. See *Barrera v. Young*, 794 F.2d 1264, 1267–68 (7th Cir.1986) and cases described there.

effectiveness of counsel and misapplication of the harmless error rule) need now be reviewed for exhaustion purposes.

■ Both those claims have indeed been exhausted. Ineffectiveness of counsel was raised in the post-conviction petition and rejected by the Circuit Court. That rejection was then appealed to both the Appellate Court and the Illinois Supreme Court. And though misapplication of the harmless error rule was not raised in the post-conviction petition, that very failure constituted a waiver of the claim under state law, precluding Winters from returning to state court to seek relief on that ground. Ill. Rev.Stat. ch. 38, ¶ 122-3 ("Any claim of substantial denial of constitutional rights not raised in the original or an amended [post-conviction] petition is waived").

Mizell could have argued Winters waived several of his claims—but he did not.[11] Under our Court of Appeals' most recent teaching, waiver (unlike exhaustion) may not be raised by a District Court sua sponte (*Barrera*, 794 F.2d at 1269):

[I]f the federal court refused to accept the waiver, explicit or implicit, by the state through its Attorney General, this would be a meddlesome intrusion into the state's internal allocation of governmental authority.[12]

Accordingly this Court will now reach the merits of each of the grounds raised for summary judgment.

## Fifth Amendment Claim

Winters argues the prosecutor's closing statement commented on Winters' failure to testify, in violation of his rights against self-incrimination. Two of the allegedly impermissible comments referred to the evidence in the case as "unrebutted" and "uncontradicted" (R. 710–11, 759):

Only one more comment about the evidence, and that is that this evidence, all this evidence that we have produced for you has been unrebutted and uncontradicted.

\* \* \* \* \* \*

You are going to be instructed that you shouldn't find Henry Winters guilty unless the facts and circumstances which were testified and proved and shown to you on that witness stand exclude every reasonable theory of innocence. Ladies and gentlemen, in this case there is absolutely, not one reasonable theory of innocence. Our case has been uncontradicted, unrebutted, and unchallenged.

Objections to both remarks were overruled (R. 711, 759). One final comment, made in response to defense counsel's query as to why certain witnesses had not been called to testify, is challenged on Fifth Amendment and other [13] grounds (R. 743):

Counsel asked where is he. He can subpoena witnesses. He has the exact right as I do to subpoena witnesses.... But just remember that we both can subpoena witnesses. This is not a one sided affair. If there's anybody he thought

---

11. Strong waiver arguments could have been asserted as to at least three of the claims. *Winters II* expressly found waiver of the Fifth Amendment claim (see n. 7). Although the court also reached the substantive merits of that claim, the procedural default is not excused. See *Farmer v. Prast*, 721 F.2d 602, 605 n. 5 (7th Cir.1983); *United States ex rel. Harris v. Reed*, 608 F.Supp. 1369, 1377–78 (N.D.Ill.1985). Misapplication of the harmless error rule was never raised at all in the state post-conviction petition and so was probably waived. Ill.Rev.Stat. ch. 38, ¶ 122-3. Finally, insufficiency of the evidence (and prosecutorial misconduct—at least as an issue separate from the Fifth Amendment claim) was raised in the state post-conviction petition but not appealed to the Appellate Court—again a predicate for a waiver ruling.

12. [Footnote by this Court] *Barrera, id.* left open the possibility that a state might decide "to entrust to the judicial branch alone the power to surrender the protection of *Wainwright,*" but found the State of Wisconsin had not done so. *United States ex rel. Bonner v. DeRobertis*, 798 F.2d 1062, 1066 n. 3 (7th Cir.1986) has since made clear the Illinois Attorney General also has broad powers and may waive a petitioner's procedural default.

13. As discussed later in the text, Winters Mem. 13–14 also urges the same comment impermissibly shifted the burden of proof.

was so important, the guy would be up there testifying.

Objection to that comment was sustained (R. 743).

*Winters II,* 132 Ill.App.3d 1162, 98 Ill. Dec. 837, 494 N.E.2d 959 examined the first two of those comments and concluded there had been no Fifth Amendment violation. Of course that is a legal determination, not a finding of fact given special weight under Section 2254(d). But this Court independently agrees none of the comments (including the third one) infringed on Winters' right against self-incrimination.

■ Direct comments on a defendant's failure to testify are per se violations of the Fifth Amendment (*Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965)). Indirect comments, such as those of which Winters complains, do so only if "the remark has the 'natural and necessary effect of calling the attention of the jury to [the defendant's] failure to testify.'" *United States ex rel. Adkins v. Greer,* 791 F.2d 590, 597 (7th Cir.1986), quoting *United States v. Lyon,* 397 F.2d 505 (7th Cir.), *cert. denied sub nom. Lysczyk v. United States,* 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968).

■ Such an effect was plainly absent in this case. First, both references to "unrebutted" evidence were to all the evidence generally—each time in summation of the closing statement. Such generalized statements, not focused on Winters' failure to testify or on specific facts as to which his testimony would have been critical, did not have the "natural and necessary effect" called for by *Adkins.* Nor is this a case like *United States v. Buege,* 578 F.2d 187, 189 (7th Cir.), *cert. denied,* 439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 183 (1978), in which only the defendant could have rebutted part of the "uncontradicted" testimony of a particular witness about a telephone conversation between the defendant and that witness.

Winters thinks it is. Winters Mem. 4 (footnote omitted) identifies four "inferences" created by respondent's witnesses that

could not have been challenged by anyone other than Winters himself:

1. Only Henry Winters could have testified as to what happened at the warehouse while on guard duty with the victim.

2. Only Henry Winters could have testified as to whether he had driven the victim's car to the place where it was found or explained why he was in possession of the car.

3. Only Henry Winters could have disputed or testified as to the circumstances under which he was in possession of the alleged murder weapon.

4. Only Henry Winters could have testified as to if or when he signed out in the morning.

But that inference-oriented statement of the issues blurs the "natural and necessary effect" test articulated by *Adkins.* In *Adkins* terms, the question is rather whether Winters was the only one who could contradict the "unrebutted" testimony that created the inferences. To that question the answer is plainly "no." This is not comparable to a situation in which, for example, the State had offered testimony by a third person who claimed to have been present at the warehouse with Winters and Fogli and to have seen Winters commit the murder. Then only Winters would be able to rebut the testimony, and any prosecutorial reference to the testimony as "unrebutted" would be verboten.

By contrast the actual evidence in this case, even the most damaging, was—if untrue—capable of rebuttal by persons other than Winters. Another security guard was with Steiner at the warehouse when Winters and Fogli arrived at midnight September 4 to begin their shift (R. 119–20). Hence that other guard could have contradicted Steiner's testimony, had it been wrong, that Winters was alone with Fogli in the warehouse when Steiner left there, and that Winters was within hearing range when Fogli was told about the gun in the desk drawer. Similarly, had Steiner been incorrect when he later identified the gun found on Winters as the gun left in the

desk drawer, some witness from Burns (which owned the gun) could have rebutted Steiner's testimony by (for example) showing a discrepancy in the serial numbers of the two guns.

Later testimony by two police officers that the warehouse had not been broken into, if incorrect, could have been rebutted by Steiner, Schulz or Elias, all of whom were present at the warehouse following the murder. Testimony by Funchess that Winters pointed a gun at Funchess and others on the day of the murder, if erroneous, was capable of rebuttal by the other theatre manager—not to mention any one or more of the crowd of theatre patrons who witnessed the struggle with Winters (R. 344). And still other evidence—notably the critical expert testimony about the characteristics of the bullets—was of such a nature that a jury would not reasonably have expected Winters himself to rebut it.

There is no need to rehearse the entire case. It was of course true—as in every criminal case—that Winters himself could have taken the stand to deny commission of the crime item by item. But were that the benchmark against which a prosecutor's reference to uncontradicted evidence must always be measured, the per se rule of *Griffin* would have universal application. There would be no room for the limitation stated in *Adkins.* Thus Winters' position proves too much.

Nor did the prosecutor's third comment on the lack of defense testimony infringe on Winters' right against self-incrimination. That comment was in direct response to defense counsel's query as to why several witnesses had not been called to testify (R. 730–31), and of course it makes no sense at all to speak of a defendant's own failure to take the stand in the context of *subpoenaing* witnesses. In the framework in which the statement was made, coming immediately after a statement that each side could subpoena witnesses, no jury could reasonbly have mistaken the statement "If there's anybody he thought was so important, the guy would be up there testifying" (R. 743) as a "natural and necessary" reference to Winters himself.

In sum, neither separately nor in combination did the prosecutor's indirect comments have the necessary effect of calling attention to Winters' failure to testify in violation of the Fifth Amendment. Winters' first claim fails.

### Prosecutorial-Misconduct Claim

■ Winters challenges prosecutorial misconduct "includ[ing] but ... not limited to" the following (Petition II ¶ 22):

1. comments during closing arguments on Winters' failure to testify;

2. comments on matters not in evidence;

3. suspicion raised to the jury on Winters' sexual proclivities; and

4. reliance on inadmissible evidence.

Before this Court can address whether such claimed misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process," *Donnelly v. DeChristoforo,* 416 U.S 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974), it must first determine whether misconduct occurred at all. Winters' first category of asserted misconduct has just been examined at length and found wanting. As to the second and fourth categories, Winters' extended argument on the prosecutorial-misconduct claim (Mem. 9–16) cites no actual examples of the nature mentioned in his list. Instead, all four examples of alleged misconduct described by Winters (Petition II ¶ 23) fall under the third (sexual innuendos) category of misconduct:

(a) The prosecutors introduced testimony that a white translucent substance was found in or around the body cavity of the deceased. This substance was never produced or identified and never linked to Petitioner.

(b) The prosecutors introduced testimony that Petitioner had told an arresting officer he thought the officer was "cute."

(c) The prosecutors introduced testimony that a tube of lipstick was taken from Petitioner at the police station following

his arrest. The lipstick was not introduced into evidence.

(d) During closing argument, one prosecutor completed the innuendo by arguing that if the state was attempting to frame the Petitioner, it would not have left so many holes in its case and would have told the jury that the white, translucent substance was Petitioner's sperm, but did not.

This Court's examination of the record discloses the prosecutor's actions did not rise to the level of "misconduct" and in no event had the effect of denying Winters a fair trial. Each of the complained-of matters requires only brief discussion.

As Mizell Mem. 15–16 and R. Mem. 6–7 correctly point out, the first example of alleged misconduct (testimony about a white translucent substance found around Fogli's body cavity) was elicited by defense counsel in his cross examination of police officer Lee Epplen (R. 317). That evidence alone can scarcely trigger a claim of prosecutorial misconduct. Indeed, the prosecution elicited testimony that no spermatozoa were found in the substance (R. 446).

As for the now-challenged testimony about lipstick found in Winters' pocket at the police station (R. 294, 351) and about Winters' remark that a police officer was "cute" (R. 155, 236), no objection was made to either matter at trial. Though this Court need not speculate on the reason for that, it might well be because the testimony came in response to general questions about what had occurred and not specific questions about Winters' possible homosexuality. Even in the prosecutor's initial closing statement, the testimony was described only briefly as part of a summary of all the evidence, without any special emphasis or mention of Winters' sexual proclivities (R. 697, 701, 704).

In fact, to the extent the testimony may have had a prejudicial impact on Winters, it was defense counsel rather than the prosecution who created it by calling attention to the evidence. Defense counsel's closing statement argued the prosecution had tried

to imply Winters was a homosexual (R. 728):

It is also suspicious, ladies and gentlemen, that the State has tried to imply that something is peculiar about Henry Winters. Maybe he's a homosexual. Why is that? Because I think several witnesses testified that there was a white, viscous substance found on the rectum of Mr. Fogli. Nobody said what it was though. They examined [Winters'] clothes, nobody found anything like that on him. You want to say that [Winters] had a tube of lipstick in his pocket, but where's that tube of lipstick that they claim they took from him? ... There were six or seven people around, but only two people said they heard Henry out of nowhere look at a police officer and say, you are cute.

In response to that argument, and really to reject rather than to offer a "speculative theory of a homosexual assault" (as Winters Mem. 10 would have it), the prosecution made the remarks in final closing statement (R. 750, 754–56) that constitute Winters' fourth example of misconduct. Under these circumstances, any argument of prosecutorial misconduct must be rejected.

One final form of asserted misconduct, not raised in Petition II but included later in Winters Mem. 13, is the prosecutor's alleged shifting of the burden of proof to Winters (*Sandstrom v. Montana*, 442 U.S. 510, 524, 99 S.Ct. 2450, 2459, 61 L.Ed.2d 39 (1979)). That challenge is based on the earlier-described comment about Winters' right to subpoena witnesses and one other sentence in the prosecutor's final closing argument (R. 734):

You see, from the beginning [defense counsel] realized he had no defense to this case.

■ Mizell R. Mem. 10 correctly says that is a new and therefore waived claim, for it was never put before the state courts. Winters can raise it here only if the *Wainwright* "cause and actual prejudice" test is met, and there is no suggestion it has been. In addition, this Court

finds the challenged remarks did not have the effect of shifting the burden of proof. Although volunteered prosecutorial comment about a defendant's right to subpoena witnesses is improper, *United States v. Wheeler,* 800 F.2d 100, 106–07 (7th Cir. 1986), this was an "invited" comment. That factor, coupled with the trial court's burden of proof instruction at the close of all the evidence (R. 768), mitigated any prejudicial impact of the statement (*Wheeler,* at 106).[14] As for the second ("no defense to this case") comment, it was simply too general to have had the effect of shifting the burden of proof to Winters. Whether the comments are viewed singly or together, they did not even approach the denial of a fair trial to Winters.

In summary, even to the extent the actions of the prosecutors could be characterized as "misconduct" (a doubtful proposition), those actions did not "warp the fact-finding function of the jury by deflecting its attention away from consideration of the evidence present at trial ..." (*United States ex rel. Crist v. Lane,* 745 F.2d 476, 482 (7th Cir.1984)). They did not violate Winters' due process rights so as to warrant habeas relief.

### Ineffectiveness-of-Counsel Claim

According to Petition II ¶¶ 26–28, the alleged prosecutorial misconduct and comments on his failure to testify were "clear" constitutional violations. Thus the failure of appellate counsel to raise those issues on direct appeal deprived Winters of his constitutional right to effective assistance of counsel. Although this Court is not bound by the legal conclusion of both the Circuit Court and Appellate Court that appellate counsel was not ineffective, it agrees there was no constitutional violation in this case.

*Strickland v. Washington,* 466 U.S. 668, 687, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984) set out the two-part and "highly deferential" test for ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient.... Second, the defendant must show that the deficient performance prejudiced the defense.

*Gray v. Greer,* 800 F.2d 644, 646 (7th Cir. 1986), applied that test to a case such as this one, where the defendant says appellate counsel was deficient for failing to raise particular claims on appeal:

> When a claim of ineffective assistance of counsel is based on failure to raise viable issues, the district court must examine the trial court record to determine whether appellate counsel failed to present significant and obvious issues on appeal. Significant issues which could have been raised should then be compared to those which were raised. Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.

■■■ This Court has reviewed the trial court record. For the reasons already discussed at length, it finds the claimed Fifth Amendment and due process violations were not "significant and obvious" or "clearly stronger" than those presented. But even were counsel's nonpresentation of those claims nonetheless to be found "defi-

---

**14.** Of course the mere fact a response may be characterized as "invited" does not end the inquiry—it is only a factor to be considered as to the fairness of the trial as a whole. *Darden v. Wainwright,* —— U.S. ——, 106 S.Ct. 2464, 2472–73, 91 L.Ed.2d 144 (1986). *United States v. Reynolds,* 801 F.2d 952, 956 (7th Cir.1986) (citations, including those to *Darden* and *Wheeler,* omitted) has just put it this way:

> Defendant contends that a portion of the prosecutor's closing argument unfairly prejudiced him by giving the jury the impression that the judge thought the defendant was guilty. The government has responded by asserting that the argument was "invited" by the defendant. The defendant raises two distinct legal issues here: whether the prosecutor's behavior was error, and if so, whether it is reversible error. The "invited response" doctrine is relevant only to the latter issue [whether the prosecutor's behavior was reversible error, not merely whether it was error].... The invited response doctrine does not give prosecutors a license to make improper arguments; it only puts such arguments in context....Once placed in context a reviewing court must decide if the defendant was unfairly prejudiced.

cient" performance, Winters would fail the second part of the *Strickland* test: Any such "deficiency" clearly did not prejudice Winters' defense. Prejudice exists only when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (*Strickland*, 466 U.S. at 694, 104 S.Ct. at 2072). Because this Court has concluded the Fifth Amendment and due process claims were without merit, it necessarily also finds the appeal would have come out the same way had the claims been advanced.

### Misapplication-of-the-Harmless-Error-Rule Claim

 Various items of evidence introduced at Winters' murder trial (blood sample from Fogli's body, key case and keys to Fogli's car, wooden slug and spent cartridge from the gun) were later excluded by the Appellate Court because of inadequate chain-of-custody proof. *Winters I*, 97 Ill.App.3d at 296, 52 Ill.Dec. at 781, 422 N.E.2d at 978. Despite that, Winters was denied a new trial because "there was other convincing and overwhelming evidence upon which to convict the defendant" (*id.*):

> On the day of the murder the defendant was placed at the scene of the crime, that showed no signs of forced entry. Ballistic tests proved that a fired bullet found under the victim's body was fired from ...the revolver belonging to Burns Security that had been at the warehouse prior to the murder. Testimony indicated that the defendant had possession of the revolver at the time of his arrest on the day of the murder. Therefore, in reliance on this other competent and independent evidence, which establishes the defendant's guilt beyond a reasonable doubt, we conclude the improper admission of evidence was harmless error. See *People v. Williams* (1980), 85

Ill.App.3d 850, 41 Ill.Dec. 110, 407 N.E.2d 608.

Absent the excluded evidence, Winters' Petition II ¶¶ 31–32 urges it is not clear beyond a reasonable doubt the jury would have returned a verdict of guilty, so that "the doctrine of harmless error impermissibly compromised his constitutional right to a fair and impartial trial."

 Habeas relief cannot be granted on that ground, because no deprivation of a federal or constitutional right is involved (as Section 2254 requires). See *Engle v. Isaac*, 456 U.S. 107, 119, 102 S.Ct. 1558, 1567, 71 L.Ed.2d 783 (1981). Winters Mem. 19 seeks to rely on *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963), but in *Fahy* the state court had found the introduction of *unconstitutionally*-obtained evidence (illegal search and seizure) to be harmless error. By contrast, the reason the evidence in this case was excluded was purely procedural: lack of foundation. "The application of a state harmless-error rule is, of course, a state question where it involves only errors of state procedure or state law." *Chapman v. California*, 386 U.S. 18, 21, 87 S.Ct. 824, 826, 17 L.Ed.2d 705 (1967).[15]

Nothing daunted, Winters' counsel attempt to create a constitutional basis for habeas relief by arguing the effect of the Appellate Court's erroneous finding of harmless error was to deprive him of a fair trial. But such an effect exists only if the properly-admitted evidence was insufficient for a finding of guilt beyond a reasonable doubt, and that separate ground for habeas relief is addressed next.

### Insufficiency-of-the-Evidence Claim

 To prevail on this final claim, Winters must negate the possibility that "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential

---

**15.** Petition II ¶ 30 asserts the harmless error doctrine applies only to mere mechanical errors and defects but not to those that substantially affect one's rights. Of course that is incorrect. Even constitutional errors may be found harmless where it is clear beyond a reasonable doubt the jury would not have returned a different verdict absent the error. *Chapman*, 386 U.S. at 22, 24, 87 S.Ct. at 827, 828; *United States ex rel. Miller v. Greer*, 789 F.2d 438, 442 (7th Cir.1986).

elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). That standard alone, and not the Illinois standard for proof of murder by circumstantial evidence (or even a combination of the two standards), governs in a Section 2254 action. *United States ex rel. Foster v. DeRobertis,* 741 F.2d 1007, 1012–13 (7th Cir.1984), *cert. denied,* 469 U.S. 1193, 105 S.Ct. 972, 83 L.Ed.2d 975 (1985). Thus the evidence at trial need not be, as Winters Mem. 17–18 asserts, citing *People v. Wilson,* 400 Ill. 461, 473, 81 N.E.2d 211, 217 (1948), "inconsistent, upon any reasonable hypothesis, with [the defendant's] innocence."

It cannot be gainsaid the erroneously-admitted items were corroborative of Winters' guilt. But it is equally undeniable they were only added nails—and not crucial ones—in Winters' evidentiary coffin:

1. Even without the matching Fogli blood sample, the jury properly had before it the wholly unexplained bloodstains on Winters' uniform shirt, at a time when he was carrying the murder weapon—only a few hours after the murder must have occurred.

2. Even without the key case and the keys to Fogli's car, the jury properly had before it the fact that car (last seen by Steiner at the warehouse where he had left Fogli and Winters alone) was found near the Alex Theatre—the place where Winters was apprehended.

3. Even without the wooden slug and spent cartridge, the jury properly had before it ample other evidence (including the ballistics evidence as to the fired bullet found under Fogli's body) to show conclusively the revolver Winters had heard Steiner describe, the identical revolver Winters was brandishing when subdued the next day at the Alex Theatre, was the murder weapon.

This is not then a situation in which the elimination of evidence makes the process of hypothesizing the decision a "rational trier of fact" could fairly reach a fictitious and unfair exercise—an essay in revisionist history. It does Winters no injustice, no disservice to hold such a rational factfinder, after reviewing only the properly-admitted evidence in a light most favorable to the prosecution, could conclude:

1. Winters was the last person seen with Fogli, alone in an abandoned warehouse, which no one could have entered unless let in from the inside.

2. Winters was aware of the handgun in a desk drawer in the warehouse, the gun later used to kill Fogli.

3. Later on the day of the murder Winters was apprehended, wearing an inexplicably bloody shirt (part of the same uniform he had been wearing when left alone with Fogli), after having pointed the same gun at several other persons—all this with Fogli's car close by the place Winters was apprehended.

Surely it is an understatement to find, in *Jackson* terms, that a rational trier of fact "could" have found Winters guilty of murder beyond a reasonable doubt. Indeed Winters I, 97 Ill.App.3d at 296, 52 Ill.Dec. at 781, 422 N.E.2d at 978 was dead right in saying "there was other convincing and overwhelming evidence upon which to convict [Winters]."

### Conclusion

There is no need for any evidentiary hearing (see Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts), nor is there any genuine issue of material fact. Mizell is entitled to a judgment as a matter of law. Winters' Petition II is dismissed on the merits.